**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SEP 04 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

CARLETON B. SYPH II,

                    *Plaintiff*

    v.

JUDGE EDWARD A. ARCE,
JUDGE JOHN THOMAS CARR,
MICHELLE DWORAK of
Women's Divorce & Family Law Group
by Haid and Teich LLP,

                   *Defendants*

) Case No: 1:18-cv-04821
) Judge Mathew F. Kennelly
) Magistrate Judge M. David Weisman
)
)
)
)

2018 SEP -4 AM 11:50

## PLAINTIFF RESPONSE TO SUA SPONTE ORDER REQUESTING ARGUMENTS TO ASSERT SUBJECT MATTER JURISDICITON.

NOW COMES Plaintiff, Carleton B. Syph II and his <u>Response to Sua Sponte Order Requesting Arguments to Assert Subject Matter Jurisdiction</u> for a <u>Complaint for Declaratory Judgment and Injunctive relief</u> against Defendants Judge Edward A. Arce, Judge John Thomas Carr, Michelle Dworak of the Women's Divorce & Family Law Group by Haid and Teich LLP, alleges, states, and avers:

It's appropriate for the administration of justice and the spirit which it rest on, to introduce this complaint by asserting; the institution of marriage and what it means to be a family in both form and perception is different. Nothing in this pleading should be mistaken for me expressing an opinion about whether it's better or worst; it's just different. Furthermore, there are significant developments in Cook County specifically; which when you consider the claims levied in **Carleton B. Syph II's** complaint, this court should be acutely aware of. That said, we'll first address the 4 sections in **Honorable Matthew F. Kennelly's** request for why under the purported *Rooker-Feldman* doctrine, **Carleton B Syph II's** complaint should not be dismissed for lack of jurisdiction.

## Opinion I

### "Seventh Circuit in Parejko v. Dunn County Circuit Court, 209"

1. In **Parejko v. Dunn County Circuit Court**, the complainant attacks the constitutionality of the states divorce statue in general, or I guess more specifically the right to grant a divorce as a means to stop the divorce proceedings. A critical distinction and reoccurring theme in **Carleton B. Syph II's** complaint, is that it does not seek to challenge the constitutionality of the statue, but instead argues the defendants have been and are applying the law unconstitutionally.

2. While we admit that **750 ILCS 5/508(b)** could possibly be interpreted as being unconstitutionally vague; Carleton B. Syph II does not advance that argument. The way we see it, the statue quite clearly explains the only defense against such a claim is if in fact a hearing had been precipitated improperly[1]; in other words if a fraud upon the court had occurred.[2] Carleton B. Syph II's complaint suggest that in fact, a fraud upon the court had occurred, and the judge's decision to ignore a mandate put in place to ensure procedural due process, help to facilitate if not perpetuate it.

---

[1] If at any time a court finds that a hearing under this Act was precipitated or conducted for any improper purpose, the court shall allocate fees and costs of all parties for the hearing to the party or counsel found to have acted improperly. Improper purposes include, but are not limited to, harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation.

[2] *Kenner v. C.I.R., 387 F.3d 689 (1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23* defines this crime as one that prevents the court from working in an impartial manner. A similar case, *Bullock v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985)* held that this kind of fraud is aimed at how the justice system works and is not a fraud between parties, etc. It is deliberately intended to influence the system and the judge and the impartial rendering of a judgment. In other words, the just functioning of the court has been corrupted by fraud upon the court.

3. We bring to the court's attention Douglass J., the dissenting justice in Younger v Harris who opinioned in favor of federal intervention to enjoin Younger from the prosecution of Harris.

> *"These evils are not so substantial that the states interest in prohibiting the threat of them outweighs the public interest in giving legitimate political discussion a wide berth."* **Younger v_Harris 401 US 37, 63.**

We bring that to the attention of this court to assert that courts include the public interest in their calculus for determining when to abstain or intervene. For reasons already presented in the complaint and additional provided in this pleading, it's in the publics best interest for the court not to abstain in this situation.

4. Furthermore, Carleton B. Syph II's complaint does not seek to challenge the **divorce** which had been settled and entered into a judgment dated 7/22/2014. The issue brought to this court doesn't seek to challenge **alimony** which both parties waived and is too entered into the 7/22/2014 judgment. The issue brought to this court does not seek to challenge **child custody;** which was established in 2013 before it too was finally entered into the 7/22/2014 judgement.

5. If anything, Carleton B. Syph II's complaint seeks to protect the state's disposition from the actions of the defendants; which were aimed at impairing that disposition.

6. For those reasons, neither the case itself nor the Seventh Circuit's decision on the matter provides a precedence, which justifies dismissing Carleton B. Syph II's complaint for want of jurisdiction.

## Opinion II

## "Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280 (2005)"

7. Critical in understanding the difference between *Rooker-Feldman*, as raised in the context of **Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280**

and Carleton B. Syph II's complaint; which also serves as a reoccurring theme throughout this pleading, is the fact that Carleton B. Syph II's complaint doesn't request the federal district court to alter any final judgement entered by the highest court of the state as described in **28 U.S. Code § 1257** and sought in *Rooker*. Carleton B. Syph II's complaint doesn't request the federal district court to rule any portion of the statue or its rules to be unconstitutional either, as was sought in *Feldman*.

8. That said, if anything, the decisions and opinions expressed in the targeted case, more supports why Carleton B. Syph II's complaint should not be dismissed for want of jurisdiction under the so called *Rooker-Feldman* doctrine. I begin to back up that argument by drawing attention to the following three quotes from Justice Ginsburg's opinion on the matter.

> *Variously interpreted in the lower courts, the doctrine has sometimes been construed to extend far beyond the contours of the Rooker-Feldman cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdictions exercised by state courts, and superseding the ordinary application of preclusion law pursuant to 28 U.S. Code § 1738"* **Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 283**

> *"Since Feldman, this Court has never applied Rooker-Feldman to dismiss an action for want of jurisdiction. The few decisions that have mentioned Rooker and Feldman have done so only in passing or to explain why those cases did not dictate dismissal."* **Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 287**

> *"When there is parallel state and federal litigation, Rooker-Feldman is not triggered simply by the entry of judgment in state court. This Court has repeatedly held that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction"* **Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 292**

9. **Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280 (2005)** was not as much about the so called Rooker-Feldman doctrine, as it was about preclusion. In fact, in the final analysis; the Supreme court remanded the case back to the federal district courts

to proceed on SABIC motion to dismiss the federal claim filed by the Exxon Subsidiaries. As the so called Rooker-Feldman doctrine did not impair the federal courts jurisdiction to consider the SABIC motion to dismiss the Exxon Subsidiaries federal claim; although the state court had already rendered a judgment in favor of Exxon Subsidiaries on a similar matter.

10. It's also important to keep in mind that Our Federalism is intended to ensure the rights of the citizenry in a way that aligns with the public interest of the state. This is why although, the federal circuit of appeals originally decided the federal district court did not have jurisdiction,

> *The Court of Appeals criticized ExxonMobil for pursuing its federal suit as an "insurance policy" against an adverse result in state court. 364 F. 3d 102, 105–106 (CA3 2004).* **Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 294 footnote 9.**

11. There is no such litigation maneuvering present in the issues at hand. In fact, there is no concurrent action in the state court against or involving the three defendants mentioned in Carleton B. Syph II's complaint that he could "insure" against in a federal complaint. Even if there was,

> *"There is nothing necessarily inappropriate, however, about filing a protective action."* **Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 294 footnote 9.**

12. For those reasons, **Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280 (2005)** does not provide good reason for dismissing Carleton B. Syph II's complaint for want of jurisdiction.

## Opinion III

### "Younger v. Harris, 401 U.S. 37 (1971)"

13. With exception that both Carleton B. Syph II's complaint and the appellants in Younger V. Harris both seek/sought injunction and now the question of whether **28 U. S. C. § 2283** bars this court's involvement; neither the facts of the cases themselves nor the arguments presented should be a worthy comparison.

14. While by no means should this be mistaken as the primary reason for why Younger V. Harris should not be considered when determining whether to dismiss Carleton B. Syph II's complaint, critical is the fact, that Younger v. Harris was clearly a criminal case. In a criminal case the presumption of innocent until proven guilty beyond a reasonable doubt provides a defendant substantially greater chance of vindication on the grounds of a constitutional violation. This presumption is so great that even in light of a confession of guilt and evidence proving beyond a reasonable doubt of the same, what some may consider a slight infringement of one's constitutional right like failing to read someone's Miranda rights, can vitiate a judgment entered against a person for committing the most heinous of crimes. The point here, is **irreparable harm** resulting from a constitutional violation is better mitigated in a purely criminal case, than it is in a juryless civil environment that allows a judge to dish out criminal like punishments at his discretion.

15. Second, Harris Jr. does not challenge that the actions of Younger himself as being unconstitutional. Instead, Harris Jr. challenges that the statue Younger is pursuing a conviction under to be unconstitutional. Carleton B. Syph II's complaint does not challenge the statue as being unconstitutional, he argues the law was being unconstitutionally applied by the defendants. To draw a parallel between Younger V. Harris and Carleton B. Syph II's complaint, which does not exist, one would have to imagine a hypothetical situation wherein which Harris Jr. wasn't challenging the constitutionality of the statue. Instead,

5

you'd have to imagine that he was challenging the constitutionality surrounding the fact that after asking Younger for a witness list and the judge ordering Younger to provide one, Younger refused to provide a list of witnesses while continuing to move forward with the prosecution. Of course, I don't know but I would imagine under that hypothetical circumstance which more mirrors the issues at hand in Carleton B. Syph II's complaint; the high court would have agreed with the district court's decision that Younger's actions were more along the lines of Pfister's in *Dombrowski v. Pfister*, **380 U. S.** 479 (1965).

16. Even in *Dombrowski v. Pfister*, **380 U. S.** 479, *Dombrowski didn't challenge that Pfister was applying the statue unconstitutionally, but instead argued* that the statue itself was "overbreadth" or so vague, that it allowed for "sweeping and improper application" by Pfister which served to infringe on *Dombrowski's* First and Fourteenth Amendment rights. The premise of Carleton B. Syph II's complaint against Judge Edward A. Arce was that he was not following the mandates under the statue, namely **Cook County Cir. Ct. R. 13.3.1(b)** and **Cook County Cir. Ct. R. 13.3.(a)**. This is why, while not officially presented in the body of the complaint, it has been argued before, that Judge Edward A. Arce was acting outside of his jurisdiction to preside over the trial held on 3/22/2017. Therefore, he was not operating in his judicial capacity, when he entered the 3/27/2017 order, the subsequent order committing Carleton B. Syph II to the Cook County Detention Center on 12/21/2017 for attempting to vindicate himself in a civil case, the 2/1/2018 ordering the entire case file sealed and impounded, nor when on 3/30/2018 he threatened to have Carleton B. Syph II recommitted to the Cook County Detention Center for again attempting to vindicate himself in a civil case; before finally entering an order barring him from filing any additional pleadings. The latter of which, allows the perpetrators of a fraud

on the court, to move the court to enforce judgments procured by that fraud, without the court "ever" being allowed to consider the evidence of the fraud perpetrated to procure the judgments it's enforcing. For those reasons, Judge Edward A. Arce is not necessarily immune to being held personally liable for the adverse effects arising from these actions.

17. None-the-less, what Younger V. Harris does provide, is confirmation that there are special circumstances outside of the three **28 U. S. C. § 2283** exceptions, that allows for a district court to consider enjoining a state court to stay proceeding. **Younger v. Harris, 401 U.S. 37 at 45**

## Opinion IV

### "and other cases; and/or under 28 U.S.C. § 2283"

18. As noted in the civil cover sheet, the cause of action for Carleton B. Syph II's complaint is

**42 U.S.C. § 1983.** It's important to assert here, this complaint is about justice and fidelity; not race.

> *"Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority, of state law upon -rights secured by the Constitution and laws of the Nation."* **Mitchum V. Foster at 239**

> *"...the Civil Rights Act of 1871 "not only provides a civil remedy for persons whose former condition may have been that of slaves, but also to all people where, under color of State law, they or any of them may be deprived of rights to which they are entitled under the Constitution by reason and virtue of their national citizenship."* **Mitchum V. Foster at 239 footnote 30**

> *"It is clear from the legislative debates surrounding passage of § 1983's predecessor that the Act was intended to enforce the provisions of the Fourteenth Amendment "against State action,... whether that action be executive, legislative, or judicial.... Proponents of the legislation noted that state Courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights."* **Mitchum V. Foster at 240**

*"Sheriffs, having eyes to see, see riot; judges, having ears to hear, hear not;: witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices.. ... [A]ll the apparatus and machinery of civil government,.all the processes of justice, skulk away as if government and justice were crimes and feared detection. Among the most dangerous things an injured party can do is to appeal to justice."* **Mitchum V. Foster at 241**

*"This legislative history makes evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts."* **Mitchum V. Foster at 242**

*"The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights-to protect the people from unconstitutional action under color of state law, "whether that action be executive, legislative, or judicial."* **Mitchum V. Foster at 242**

*"And this Court long ago recognized that federal injunctive relief against a state court proceeding can in some circumstances be essential to prevent great, immediate, and irreparable loss of a person's constitutional rights."* **Mitchum V. Foster at 242**

*"§ 1983 is an Act of Congress that falls within the "expressly authorized" exception of that law."* **Mitchum V. Foster at 243**

**19.** The deprivation of a constitutional right can sometimes be the result of a singular act or decision made by one person. However; often it is a collection of acts and decisions over time coordinated by many people. An argument backed up by the fact, that from its inception **42 U.S.C. § 1983** was intended to deal with an organization. The argument to be made here, is being a part of a particular organization per se, is not a prerequisite for people to organize for the purpose of depriving someone or some people of their right(s). They need only a common goal and logic suggest, a relative benefit for accomplishing that goal.

20. That said, Michelle Murray has spent over $70,000 with the attorneys mentioned in this complaint; about $33,000 of which by her own account was spent in 2017 alone. To put

those figures into perspective, if none of the judgements in the state court are changed, which I reiterate Carleton B. Syph II's federal complaint does not ask this court to do, <u>all of the money he has spent</u>, and it approaches all the money he will ever spend on child support for his 10-year-old daughter, has already been given to the lawyers in this complaint.

Pleading filed 2/23/018 by attorneys at **Beermann Pritikin Mirrabelli Swerdlove LLP**

17.      As a result of Carleton's conduct, Michelle has expended over $50,000 in attorney's fees since the Judgment for Dissolution of Marriage was entered by this Court on July 22, 2014, of which $33,000 was expended in 2017 alone. She has spent another $3,500 to retain

... **Beermann Pritikin Mirrabelli Swerdlove LLP**

21. Those facts are raised,  to assure this court that any and all arguments presented by the defendants which attempt to tie Carleton B. Syph II's litigation with a dissatisfaction with his ex-wife or the judgements, are neither well placed nor made in good faith. Sure, a denial of due process leading up to a hearing creates an unfair environment, which most times will lead to an unfair judgment, but that's not why Carleton B. Syph II seeks redress in the federal court.

22. It's not the judgments themselves, it's the conduct leading up to and following the judgments which serves as the basis for Carleton B. Syph II's **42 U.S.C. § 1983** complaint [3]. Any suggestion otherwise by the defendant's or anyone else for that matter, are but flailing attempts to draw this court's attention away from the clear evidence of the fraud, the Judge's deliberate denial of due process which helped to facilitate if not perpetuate it,

---

[3] **(See Exhibit A)** The pleading and corresponding complaint support the basis for the relief requested in Carleton B. Syph II's complaint. Exhibit A should be considered context to be included along with the record.

and their efforts to cover it all up by impounding the entire case file and barring any official mention of it. **(See Exhibit B)**

23. It's argued here that the allegations mentioned in Carleton B. Syph II's complaint, the previous paragraphs, is why Congress enacted **42 U.S.C. § 1983** in the first place. For that reason, which is backed up by the following citation, **28 U.S.C. § 2283** does not provide good reason for dismissing Carleton B. Syph II's complaint for want of jurisdiction.

*"§ 1983 is an Act of Congress that falls within the "expressly authorized" exception of that law."* **Mitchum V. Foster at 243**

## Final Analysis

24. While the four opinion's/interpretations above, addresses why this court should not dismiss Carleton B. Syph II's complaint for want of jurisdiction; the reason for why this matter arises to this level can be attributed to the defendants' decisions to first seal and impound the entire case file, then bar Carleton B. Syph II from filing any additional pleadings. The combination of which, is an insidious violation of Carleton B. Syph II's First Amendment rights. A violation equal to, if not more profane to the administration of justice, than the Fifth & Fourteenth Amendment violations levied in the official complaint before this court.

25. It's important to reiterate in this pleading that it is only appropriate to:

*permanently enjoin **Judge Edward A. Arce** and **Judge John Thomas Carr** from further ruling on or enforcing any orders entered by **Judge Edward A. Arce**, and preliminarily enjoin the entirety of the Cook County Circuit Court Domestic Relation's justices from further ruling on or enforcing any orders entered for case 12D009167.*

26. To further justify the relief requested, I start by explaining there are only three issues at play in case 12D009167.

a. There's the $500.00 per month Child Support Order entered on 6/7/2013 and the corresponding $300.00 per month arrearage ordered entered on 3/30/2018.[4]

b. There's the $8,797.77 judgment for attorney fees entered on 8/4/2017 and the corresponding contempt order entered against Carleton B. Syph II for his inability to pay those fees, entered on 6/7/2018.

c. There's a portion of the 6/7/2018 order which attempts to enforce a preliminary injunction that was never entered, as part of a ruling on a Petition for Rule to Show Cause.

### 26(a) The $500 and $300 per month Child Support Orders

27. As can be seen below the $500.00 per month child support order has always been paid through and enforce by the State. There were some questions leading up to the dissolution of marriage proceeding as to whether an arrearage in child support would be added to the $500.00 per month order entered on 6/7/2013. That question was settled on 7/22/2014 when the Judge ordered that the child support obligation should have begun in January 2013. She then considered what Carleton B. Syph II had already paid in 2013 and calculated an arrearage amount as can be seen below. [5]

### 6/7/2013 Order excerpt

---

[4] The $300.00 per month arrearage order is topic of contention, but the contention is only collaterally related to this federal complaint for that reason it's not raised.

[5] This is a significant reason and a portion of the contention expressed in footnote 3.

☑ CHILD SUPPORT   OR ☐ UNALLOCATED SUPPORT

Payment Amount:

Current Child Support Payment or       *Payment Frequency:*
Unallocated Support Payment: $ _500 °°_
Arrearage/Retroactive Payment: $ _____          ☐ every week
Other Payment                  $ _____          ☐ every other week
Payments Begin: _immediately_ (date)              ☒ monthly
Judgment in the amount of    $ _0_                 ☐ twice each month on _____ & _____
is entered against the Obligor on the arrear.     ☐ other _____ (date)
Interest                     $ _____

☒ PAYMENT ARRANGEMENTS

```
C    ☒   (Payments must be sent to the STATE DISBURSEMENT UNIT if this box is checked.)
H
E        A Notice to Withhold Income shall be issued immediately and shall be served on the employer at the address listed
C        in this Order.  Payments shall be made payable to the State Disbursement Unit and sent to the State Disbursement
K        Unit at P. O. Box 5400, Carol Stream, IL 60197-5400.  Payments must include CASE NUMBER, COUNTY of the Court
         issuing this Order, and Obligor's name and social security number.  Any subsequent employer may be served with a
O        Notice to Withhold Income without further order of the Court.
N

4386 ☒   In addition to and separate from amounts ordered to be paid as maintenance or child support, the Obligor shall pay a
         $36 per year Separate Maintenance and Child Support Collection Fee.  This sum shall be paid directly to the Clerk of
         the Circuit Court of Cook County, at 28 N. Clark St. Room 200, Chicago, IL 60602, and *not* to the State
         Disbursement Unit.
```

**7/22/2014 Dissolution of Judgement Excerpt**

> Michelle's Petition for Child Support was filed on January 8, 2013. The Court, on June 7, 2013, entered an order requiring Carleton to pay monthly child support in the amount of $500.00 with arrears to be determined. The Court determines that it is appropriate to enter the child support order retroactive to January, 2013. The evidence adduced at trial demonstrated that Carleton failed to pay the court ordered child support in November and December, 2013. Given the retroactive application of the child support order to January, 2013 and Carleton's self- imposed arrearages, Carleton is in arrears in child support in the amount of $2,950 through December 31, 2013. Carleton shall pay said child support arrearage and any other arrearage that has accrued since the date of the trial of this cause on or before September 8, 2014.

This should not be mistaken for Carleton B. Syph II relitigating the facts or trying to alter any of the judgements. It's only brought to this courts attention to assure it, that the issue in 26(a) has to some extent been over satisfied by Carleton B. Syph II. It currently is and always has been enforced by the state, without any legitimate intervention by the Cook County Domestic Court Judges, including **Judge Edward A. Arce** and **Judge John Thomas Carr**. For this reason, there will be no harm to **Judge Edward A. Arce, Judge John Thomas Carr** or other Domestic Court Relations Justices if they were to be enjoined.

### 26(b) The $8,797.77 judgment for attorney fees

28. We now address the $8,797.77 judgment for attorney fees entered on 8/4/2017; which purportedly represents the litigation efforts between 10/27/2015 and 6/5/2017 to enforce an order. Again, we draw attention to the judgement not for the purpose of directly attacking or altering it. Instead, we raise the judgement itself only so that it may be viewed in context with Carleton B. Syph II's **42 U.S.C. § 1983** complaint.

> "...*Congress...realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts.*" **Mitchum V. Foster at 242**

> "...*the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights.*" **Mitchum V. Foster at 240**

29. When considering the judgment in context with the **42 U.S.C. § 1983** complaint, do so with the **750 ILCS 5/508b** [6]statue itself and **Exhibit C** (A schedule of child support payments and payment accruals) in mind.

30. As can be seen on page 2 of **Exhibit C,** in May of 2016, the month when Carleton B. Syph II filed his petition to modify child support, he was ahead of his obligation by $1,150.00.

| Collection Date: | Amount | Balance | work Group |
|---|---|---|---|
| 5/1/2016 | $ 500.00 | $ (650.00) | Accrual |
| 5/16/2016 | $ (500.00) | $ (1,150.00) | 437525 |

---

[6] (b) In every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was **without compelling cause or justification**, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party. If non-compliance is with respect to a discovery order, the non-compliance is presumptively without compelling cause or justification, and the presumption may only be rebutted by clear and convincing evidence. If at any time a court finds that a hearing under this Act was precipitated or conducted for any improper purpose, the court shall allocate fees and costs of all parties for the hearing to the party or counsel found to have acted improperly. Improper purposes include, but are not limited to, harassment, unnecessary delay, or other acts needlessly increasing the cost of litigation.

In fact, Carleton B. Syph II had been running a credit balance since 10/27/2015. That's only brought to this courts attention to support, that any litigation efforts which can truly be for the enforcement of an order Carleton B. Syph II's was purportedly failing to comply with *"without compelling cause or justification"*, are those following his petition to modify child support. As it's unreasonable to believe Carleton B. Syph II was failing to comply with the order prior to this date, if on the day he filed his petition to modify child support he had over satisfied the obligation. That would be equivalent to holding someone accountable for the late fee on a speeding ticket, they overpaid on time.

31. Therefore, the only efforts which could reasonably be assigned to the enforcement of an order that Carleton B. Syph II failed to comply with, are those between the time he filed his petitions to modify child support and the day the attorney formally withdrew her representation on the matter. (Between 5/26/2016 and 6/5/2017.) [7]

32. A reasonable person would consider the litigation efforts between 5/26/2016 and 6/5/2017, as being nothing other than the cost of perpetrating a fraud to ensure an improper precipitation of the 3/22/2017 hearing. [8] As the litigants mentioned in the exhibit, requested no discovery over the time span nor does the record reflect them challenging any of the merits of the case. If not all, then an astounding amount of their activity during this time frame are certainly fraudulent thus improper, and quite possibly harassing too.

---

[7] Technically, the time frame for *"efforts which could reasonably be assigned to the enforcement of an order that Carleton B. Syph II's failed to comply with"* would begin sometime after 7/1/2016 when the credit balance expired. We provide this footnote, to help this court see the distinction between challenging the judgments themselves and the reason for the **42 U.S.C. § 1983** complaint.

[8] (See **Exhibit D**) The pleading and corresponding complaint support the basis for the relief requested in Carleton B. Syph II's complaint. The arguments/evidence in **Exhibit D** are not put forth in this complaint; which does not seek to alter the judgments arising from decisions and actions within. It should be used as context to be included along with the record.

33. The evidence and arguments in the exhibit are highlighted here, to assure this court that issuing an injunction to stay proceedings focused on enforcing this judgment, is in the best **interest of the public**. [9] As the alternative, would legitimize the decisions and the actions. Neither of which, can be considered to reflect the appropriate way to enforce a child support order as outlined in **750 ILCS 5/508(b)** nor the appropriate use of the tools and processes put in place to administer justice.

> *"The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights-to protect the people from unconstitutional action under color of state law, "whether that action be executive, legislative, or judicial."* **Mitchum V. Foster at 242**

34. Surely there are some concerns and I state here, that I have an appreciation for the pause given to a request to enjoin two judges, not to mention an entire division of judges. However; when considering the litigation efforts between 5/26/2016 and 6/5/2017, the question is not whether the judgments should be enforced, but instead what judge or judges want(s) to enforce them. We know Judge Edward A. Arce wants to, and based on the statements he made during the 11/16/2017 hearing to disqualify Judge Edward A. Arce we can safely assume Judge John Thomas Carr would also want to.

**Judge John Thomas Carr** "during 11/16/2017 hearing to disqualify Judge Arce"

```
7   wrong.  We decide prejudice, and there is nothing --
8   nothing that i saw in your motion or in your reply that
9   indicated that Judge Arce was prejudiced.
```

---

[9] After withdrawing on 6/5/2017 in order to be substituted in for the Women's Divorce and Family Law Group LLP attorney Dworkin both filed an additional pleading in support of her petition for Fees and then showed up to the 7/28/2017 hearing to argue in favor for it. I bring that to the attention of this court to point out that on 7/28/2017 there were 3 if no 4 different attorneys from two different law firms present, during the 7/28/2017 hearing held on Carleton B. Syph II's Motion to Reconsider.

The very first arguing paragraph from the **735 ILCS 5/2-1001(a)(3)** petition is depicted below.

> 1. Ignoring his own order, which required **MURRAY** to provide proof of her 2016 income, not only violated my constitutional right to due process leading up to the 3/22/2017 hearing, the lack of impartiality which gave rise to the violation, is helping the opposing party and its attorneys cover up a racket. A fraud committed in Lake County Circuit Court, which has enabled the opposing party to commit a fraud in case 12D009167 filed in Cook County Circuit Court.

According to the process communicated to Carleton B. Syph II, Judge John Thomas Carr was randomly selected from a pool of judges to rule on the matter. We are of the opinion that a random selection from a population is intended to at least represent the whole, the majority or a significant minority of the population. Logic would then suggest, that Judge John Thomas Carr for all practical purposes knew that his judgment on the matter would represent the whole of the Domestic Relations judiciary, and he meant to communicate that neither he nor any of the other justices presiding over cases in the Domestic Relations Division at 50 Washington, saw anything prejudicial about a judge ignoring his own order to ensure procedural due process. If Judge John Thomas Carr/Domestic Relations Division justice didn't find it prejudicial for Judge Edward A. Arce to ignore his own order, not to mention the mandatory rules laid out in **Cook County Cir. Ct. R. 13.3.1(b)** and **Cook County Cir. Ct. R. 13.3.(a)**, then logic would suggest they'd have no problem awarding parties who exploit similar opportunities to perpetuate frauds in their courts.

24. An example of one such judgment, which may have been influenced by **JUDGE EDWARD A. ARCE'S** association with a person who bribed judges for favorable rulings, is his decision to go out of his way to award the opposing party $8,794.77 in attorney fees. While the details which prove ex parte communication between **JUDGE**

35. When given an opportunity to speak/argue for the masses even if that is not your intent, you have to assume the minute group of individuals your communicating with, will to some extent interpret your words and actions to represent the sentiments of the masses you're representing. For this reason, I take this complaint and all of the words presented within it serious. As while I can't speak for Judge John Thomas Carr, Judge Edward A. Arce has been sued in federal court before. I don't know enough about the action in the state court to express any opinion about the legitimacy of the federal complaints, but in light of the evidence and arguments in this complaint the court should be aware of that fact.

## 26(c) attempts to enforce a preliminary injunction that was never entered, as part of a ruling on a Petition for Rule to Show Cause

36. The court should take note, that Carleton B. Syph II's **42 U.S.C. § 1983** complaint and all corresponding pleadings and exhibits, most of which are needed to back up the claims in his complaint, originate from the case file for 12D009167. The Circuit Court of Cook County must transmit a certified copy of that case file to the State Appellate Court, to facilitate the appeals process. With that in mind consider the following three facts.

   a. On 2/1/2018, **The Woman Divorce and Family Law Group LLP** motioned for and Judge Edward A. Arce entered an order, sealing and impounding the entire case file. This prevents Carleton B. Syph II from appealing any decisions; which

satisfies the **irreparable harm** factor considered when deciding to enter an injunction.

b. On 3/30/2018, **Beermann Pritikin Mirrabelli Swerdlove LLP** motioned for and Judge Edward A. Arce entered an order, barring Carleton B. Syph II from filing any additional pleadings. This prevents Carleton B. Syph II from defending himself in court against any claim levied against him. The **balance** of harm clearly leans toward Carleton B. Syph II, in this regard.

c. On 6/7/2018 Judge Edward A. Arce ordered Carleton B. Syph II to sign an affidavit attesting to the fact that he destroyed all evidence of the fraud or pay the perpetrators $25 per day for everyday until he does so. This would essentially destroy all evidence of the crimes and injustices which have already been committed. This surely would not be in the best **interest of the public**.

*"It is clear from the legislative debates surrounding passage of § 1983's predecessor that the Act was intended to enforce the provisions of the Fourteenth Amendment "against State action,... whether that action be executive, legislative, or judicial.... Proponents of the legislation noted that state Courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights."* **Mitchum V. Foster at 240**

d. The culmination of the facts listed in the previous sub paragraphs are not only a perfect example for why Congress enacted **42 U.S.C. § 1983,** because the defendants have either schemed to interfere with service of the summons or have simply chosen not to respond to the claims in the complaint, Carleton B. Syph II should be granted the motion for default judgment on Count I and Count III. The latter of which; satisfies the **likelihood of success** factor; that must be considered when entering an injunction.

37. The defendants seem to have become so agitated with the facts which proves that a fraud upon the court has occurred, they're more inclined to implement the measures in 36(a), 36(b) and 36(c) than simply void the orders. Without the intervention of this court, there's no reason to believe the pattern of actions by these individuals, which have grown in their profaneness to the administration of justice, will change. That said, we believe that only by the slimmest of margins, the injunction requested would be more beneficial to Carleton B. Syph II than it would be for the legitimate administers of justice in the Circuit Court of Cook County.

> *Proponents of the legislation noted that state Courts were being used to harass and injure individuals, ...because the <u>state courts</u> were powerless to stop deprivations... of federally protected rights."* **Mitchum V. Foster at 240**

## Conclusion

38. It's fitting for me to conclude this pleading almost how it' began, by asserting that the institution of marriage and what it means to be a family in both form and perception is different. Consequently, the whole idea of divorce and single parenting, or more appropriately put co-parenting, in both form and perception is different. Based on recent developments in Cook County specifically, it's more important than ever for this court to keep in mind the constitutional ramifications of this change in perception and form.

39. The business surrounding domestic relations is a high yield unregulated industry. One where the benefits of operating as officers of a private business are interchangeable with the authority and immunity afforded a government function. When convenient these officers assert the authority and immunity of the government, then put on the hat of a private company to evade the restrictions an objectivity expected of a government function.

To understand the argument here, consider the following excerpt from an invoice submitted as part of an affidavit to support a petition for the award of attorney fees under **750 ILCS 5/508(b).**

| 1/9/2013 | Drafted the Petition for Contempt and sent to Michelle after speaking to her, to IDES (which would not confirm unemployment benefits), Sandy Smith (colleague who will call Michael and scam him) | | 1.43333 | 275.00 | 394.17 | |
|---|---|---|---|---|---|---|

40. Was this attorney operating as an officer of the court when she deployed "Sandy Smith" to scam this citizen out of information the Illinois Department of Employment Services would not provide? To understand the concern, the court must ask what does that scam to deprive a person of private information look like? The possibilities are limitless. However; the real issue is whether the individual was operating as an officer of the court or as a private citizen. If she was operating as an officer of the court when she ordered Sandy Smith to scam Michael, and the court awarded her petition for attorney fees, wouldn't this be evidence of an effectuated conspiracy to violate Michael's Fourth Amendment rights? If she was operating as a private citizen, then I guess the question rest with what the court considers "unreasonable searches".

41. Wondering whether this is an isolated situation? Don't; instead consider the following order written up by the Woman's Divorce Family Group LLP and signed by Judge Edward A. Arce, not for the content of the order, but instead consider the form of the form itself. I've included boxes around the areas of interest.

Order | (Rev. 02/24/05) CCG N002

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

In re the Former Marriage of:

MICHELLE MURRAY

v.    Petitioner    No. 12 D 1167

CARLETON C - YPH II    Cal 63

Respondent

**ORDER**

This matter having come before the court on Petitioner's Emergency Motion to enforce and enforce court orders court of not Petitioner present petitioner present, Respondent not present, and the court being advised in the premises, IT IS HEREBY ORDERED.

(1) The Emergency Motion is granted.

(2) The court sealed and impounded pursuant to the previous orders entered June 24 2018 and November 16, 2018

Attorney No.: 57650

Name: _____

Atty. for: Petitioner

Address: _____    Dated: _____

City/State/Zip: Chicago IL 60601

Telephone: 312 - 445 - 98__

**ENTERED:**

Judge Edward A. Arce

FEB - 1 2018

Circuit Court - 1980

Judge

Judge's No.

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

42. Now consider the following order on 3/30/2018, again not for the content, but instead consider the form of the form itself. I've included boxes around the areas of interest.



ORDER

CCG-N002

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

MICHELLE MURRAY

v.

NO. 12 D 9167

CARLEON SYPH

CAL 63

ORDER (1/2)

This cause coming to be heard for hearing pursuant to 12/21/17 and 2/22/18 orders, both parties appearing in person and Petitioner appearing through counsel, the Court having heard testimony and arguments, and having Due advised it is hereby ordered that:

2-1101 petition

1. Respondents motion to Set Aside 3/12/12 Judgment is dismissed with prejudice, for the reasons stated on the record.

2. Respondents 2-616 motion to Amend said petition is denied.

3. Respondents 2-1001 (a)(4) Motion to Disqualify Judge Axel is denied for the reasons stated on the record.

4. Mebelle's Petition to Require Respondent to Obtain leave of Court... is GRANTED. Prior to filing any document with this Court, Respondent shall first present the same to Judge Axel and obtain written permission to file and serve such document.

| Atty No. | 80095 |
|---|---|
| Name | Beermann Pritikin Mirabelli Swerdlove LLP |
| Attorney for | , 20 ___ |
| Address | 161 N. Clark Street, Suite 2600    ENTER: |
| City/ Zip | Chicago, Il 60601 |
| Telephone | 312-621-9700    Judge    Judge's No. |



ORDER

CCG-N002

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

MICHELLE MURRAY

v.

CARLEON SYPH

NO. 12 D 9167

CAL 63

ORDER (2/2)

5. Respondent shall pay the sum of $300 per month to Petitioner as and for payment towards his existing support arrearage.

6. IDHFS is ordered to perform an account adjustment review in order to determine the amount of Respondents support arrearage.

7. Hearing on Michelle's 6th Petition for R.b to Show Cause, 2nd Motion for Sanctions, and Petition for Attorney's Fees shall be held on Jan 7, 2018 at 11:30am

8. ~~All provisions of both prior orders not changed herein shall remain in full force and effect~~

9. This an IDHFS account adjustment review, the source of sanctions per 9/18/17 order, and all other pending matters shall occur on said Jan 7, 2018 date.

| Atty No. | 80095 |
|---|---|
| Name | Beermann Pritikin Mirabelli Swerdlove LLP |
| | M. Elste |
| Attorney for | Michelle Murray |
| Address | 161 N. Clark Street, Suite 2600 |
| City/ Zip | Chicago, Il 60601 |
| Telephone | 312-621-9700 |

ENTERED

Judge Edward A. Arce

MAR 30 2018

Circuit Court – 1980

Judge          Judge's No.

43. This is the third page of a three-page carbon copy form already partially pre-printed with the Circuit Court of Cook County and the law firm's credentials on it. It's designed to integrate with the courts internal procedures for capturing and communicating orders. Note that the law firm credentials on this form corresponds with the law firm who wrote

up the depicted paragraph first mentioned in paragraph 20 of this pleading and shown again below.

filed on 2/23/018 by attorneys at **Beermann Pritikin Mirrabelli Swerdlove LLP**

17.    As a result of Carleton's conduct, Michelle has expended over $50,000 in attorney's fees since the Judgment for Dissolution of Marriage was entered by this Court on July 22, 2014, of which $33,000 was expended in 2017 alone. She has spent another $3,500 to retain

44. The federal question here is after informing the court and **Beermann Pritikin Mirrabelli Swerdlove LLP** that he was attempting to serve a summons, can **Beermann Pritikin Mirrabelli Swerdlove LLP** now hire Sandy Smith to scam Carleton B. Syph II into providing information about the complaint he's trying to serve, before he serves it?

45. Of course, I don't know these answers, but I do know the recent changes in the Cook County Domestic Relations division are not only monumental, but both responsive and engineering. The change moves a mostly objective administrative activity, which has traditionally been managed by people whose job is secured by their adherence to a written job description and union representation, to an adjunctive proceeding presided over by those whose job security is political in nature, and to some degree dependent on political contributions from the legal professionals that appear before them. Again, I express no opinion about the appropriateness of the change and only bring it up in the context of this pleading, to support that granting the relief requested in Carleton B. Syph II's **42 U.S.C. § 1983** is in the best interest of the public.

> *Proponents of the legislation noted that state Courts were being used to harass and injure individuals, ...because the* state courts *were powerless to stop deprivations... of federally protected rights. "* **Mitchum V. Foster at 240**

46. When viewing **Exhibits W, X, Y & Z**, remember the following.

a. *"Michelle Murray has spent over $70,000 with the attorneys mentioned in this complaint; about $33,000 of which by her own account was spent in 2017 alone. To put those figures into perspective, if none of the judgements in the state court are changed, which I reiterate Carleton B. Syph II's federal complaint does not ask this court to do, all of the money he has spent, and it approaches all the money he will ever spend on child support for his 10-year-old daughter, has already been given to the lawyers in this complaint."*

b. *While a significant number that represents or approaches the majority, will consider Argument #1, 2(a), 2(b) and 3 (the first four arguments) presented in Carleton B. Syph II's 1203 Motion to Reconsider to in fact be an attempt to bring to the courts attention an error in law and misapplications of the facts, there will be those who will not only view it as the opposite, but will consider it as an attempt to harass the litigant and attorney's they've ruled in favor of.*

THE COURT: All right. I don't need to hear from the other side. The motion to reconsider, the 1203, addresses areas of law that the Court made, or misapplication of the facts. Nothing that I just heard from Mr. Syph, or in his motion to reconsider, which I read before coming out, deals with errors of neither aspect. The case that I heard was a case where he was asking to modify a support order. I found that my findings in the order indicate that he failed to establish that there was a substantial change of circumstances as to him. And based on that alone, there was no basis to modify the order which he requested. So there is no -- that I heard, no errors of law that I made, no misapplication of the facts. The facts are actually fairly simple.

Name Under the penalties as provided by law pursuant to Section 5/1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she/he verily believes the same to be true.

Respectfully submitted by,
CARLETON B. SYPH II

Pro se Plaintiff

**Date:** 9/2/2018

26

Carleton B. Syph II
848 Dodge Ave #426
Evanston, IL 60202
Telephone 224-725-0765
Email: greenerlaundry@gmail.com

# Exhibit A

Excerpt from collateral pleading "Judge Edward A. Arce Conduct up to and following the hearing."

*Disclaimer:*

*The following is an excerpt from a pleading directly challenging state court judgments; which the purported Rooker-Feldman doctrine at least encourages this court to abstain considering. It's reasonable to expect some overlap in arguments aimed at attacking state court judgments with those levied in a 42 U.S.C. § 1983 compliant seeking federal redress for constitutional violations in state court proceedings. While I caution that this is not an official pleading as you'll find reference to paragraphs and exhibits which are not included with it I've added the (735 ILCS 5/1-109) Certification to attest to the authenticity of the arguments and evidence within.*

## Count IV

### Rule 63 - CANON 3
A Judge Should Perform the Duties of Judicial
Office Impartially and Diligently
### Deliberate excess of jurisdiction

1. Had **Judge Edward A. Arce** been diligently performing the administrative and adjunctive responsibilities of the judiciary as outlined in **Ill. S. Ct. R. 63(A)(9)** and **Ill. S. Ct. R. 63(B)** between 5/20/2016 and 2/09/2017, the arguments and corresponding evidence presented in the trial court and then again in the preceding paragraphs of this pleading, would do more to support why this case should have never escalated to a level requiring this Court's intervention.

2. To understand the previous paragraph, it's argued had **Judge Edward A. Arce** been adjudging patiently as out line in rule **63 Canon 3 A (3)** [1] the 3/22/2017 the hearing date

---

[1] **Rule 63(A)(3)** A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control.

would not have been set on 1/26/2017. As he would have provided **Michelle Murray and Attorney "Dworkin"** yet another order of continuance in order for them to tender proof of 2016 income as required by **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2.** However; it's equally important and indicative of the uniqueness of this case to note here, that such patients would not have equated to the impartiality that can be deduced from **Ill. S. Ct. R. 63(A)(9).**[2]

3. In fact, because written within **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2,** are rules for when mandatory disclosure and proof of income must be tendered, granting yet another order of continuance for **Michelle Murray and Attorney "Dworkin"** on 1/26/2017 without a 219 Sanction which is also a part of those rules would have actually been reflective of a lack of impartiality; if not a biasness in favor of the party whose efforts were aimed at circumventing **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2.**

4. For the reason mentioned in the previous paragraph the healthy level of skepticism **Carleton B. Syph II** maintained about the judge's impartiality was to some extent cast aside, in exchange for a belief in an impartial judiciary; when he accepted **Judge Edward A. Arce** decision to set the 3/22/2017 court date without requiring **Michelle Murray and Attorney "Dworkin"** to satisfy his 6/7/2016 order to be reflective of the judge's

---

[2] **Rule 63(A)(9)** A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not permit staff, court officials and others subject to the judge's direction and control to do so.

professional competence.[3] As there is language within the rules themselves which explains that failure to comply with the rules is not a justifiable reason for continuing the hearing.[4]

5. Rather than allowing counsels and their clients, to slow down the judicial system with repeated delays and lofty arguments against providing discovery and/or adhering to the rules outlined in **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R 13.3.2** as **Michelle Murray and Attorney "Dworkin"** had been doing between 7/26/2016 and 1/26/2017; within the rules are remedies for a judge to protect citizens from this type of abuse. Remedies which essentially allows a trial to be held, even if the party fails to satisfy the mandatory disclosure as outlined in **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2**.

6. The specific remedies available to a judge when a party refuses to comply with **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2**. are spelled out in **Ill. S. Ct. R. 219**. In fact, on 1/26/2017 when **Carleton B. Syph II** explained to the judge what impact the opposing party's failure to satisfy the rules out as outlined in **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2** would have on his ability to present his case; as reason to delay setting the hearing date, **Judge Edward A. Arce** explained that if **Michelle Murray and Attorney "Dworkin"** didn't satisfy the 6/7/2016 order, he would expect for **Carleton B. Syph II** to move to bar testimony. The judge's suggestion not only aligned perfectly with the remedy outlined in **Cook Co. Cir. Ct. R. 13.3.1(c)** [5] and **Ill. S. Ct. R. 219(c)(iv)**[6]

---

[3] **Rule 63(A)(1)** A judge should be faithful to the law and maintain professional competence in it. A judge should be unswayed by partisan interests, public clamor, or fear of criticism.

[4] **County Cir. Ct. R. 13.3.1 (c)** ...Failure to comply shall not be sufficient cause for a responding party not in compliance to obtain a continuance of the hearing.

[5] **County Cir. Ct. R. 13.3.1 (c)** Failure of a party to timely serve the "Financial Affidavit" shall subject the non-complying party to such sanctions as the court deems appropriate, including all sanctions available under Illinois Supreme Court Rule 219.

[6] **Ill. S. Ct. R. 219(c) Failure to Comply with Order or Rules.** If a party, or any person at the instance of or in collusion with a party, unreasonably fails to comply with any provision of part E of article II of the rules of

but was also considered by **Carleton B. Syph II** to be reflective of both the judge's professional competence as outlined in **Rule 63(A)(1)** and fairness as can be deduced from **Rule 63(A)(4)[7]**.

7. This is why it's argued here, had **Judge Edward A. Arce** been Performing the duties of Judicial Office Impartially and Diligently on 1/26/2017, when **Carleton B. Syph II** explained that all discovery had not been exchanged, he may have still set the 3/22/2017 court date without requiring **Michelle Murray and Attorney "Dworkin"** to satisfy his 6/7/2016 order. Had **Judge Edward A. Arce** been Performing The duties of Judicial Office Impartially and Diligently, when presented with **Carleton B. Syph II's** Motion to Compel them to do so on 2/09/2017, he may have still let the 3/22/2017 hearing date stand without entering an additional order requiring the opposing party to adhere to his 6/7/2016 order.

8. That said, there was no reason to believe nor was there any justifiable reason to support why **Judge Edward A. Arce** would deny both **Carleton B. Syph II's** motion compelling **Michelle Murray and Attorney "Dworkin"** to comply with his 6/7/2016 order and his motion to bar their testimony for failing to do so. None-the-less his decision to deny both motions on the day of the hearing, in theory amounted to a failure to observe the safeguards to ensure a fair hearing; which played out in practice as expected. As **Michelle Murray and Attorney "Dworkin"** were allowed to testify and present arguments about the authenticity of **Carleton B. Syph II's** petitions and the truthfulness of his financial

---

this court (Discovery, Requests for Admission, and Pretrial Procedure) or fails to comply with any order entered under these rules, the court, on motion, may enter, in addition to remedies elsewhere specifically provided, such orders as are just, including, among others, the following: **(iv)** That a witness be barred from testifying concerning that issue.

  [7] **Rule 63(A)(4)** A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge may make reasonable efforts, consistent with the law and court rules, to facilitate the ability of self-represented litigants to be fairly heard.

disclosure; while on the other hand **Carleton B. Syph II** was only allowed to reference financial information tendered by **Michelle Murray and Attorney "Dworkin"** that he knew was false. Normally such a situation, would work out in favor of the truthful party proving in open court the false testimony of the opposing party. However; in addition to denying Carleton B. Syph II' motion to bar their testimony for not satisfying his 6/7/2016 order which allowed the opposing party to testify and challenge the authenticity of his disclosure the judge admonished **Carleton B. Syph II** for proving in open court that most the statement tendered leading up to the trial and during the trial was false.

9. **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.21** are not discretionary their compulsory. Therefore, failing to enforce these rules before the hearing can't even be considered an abuse of discretion. Instead, presiding over a hearing without enforcing these rules was simply an excess of jurisdiction; which among other things renders any judgement that arose from it void.

10. The actions and decisions spelled out in the previous paragraphs, is indicative of the type of prejudicial trial conduct that would later prompt the filing of a **735 ILCS 5/2-1001(a)(3)** Petition to disqualify Judge Edward A. Arce.

Count V

Rule 62 - CANON 2
A Judge Should Avoid Impropriety and the Appearance
of Impropriety in All of the Judge's Activities
**Encouraging Perjury and Fraud**

It's more important in this final count to explain that there is a significant overlap between the fraud upon the court perpetuated by **Michelle Murray and Attorney Dworkin** to procure the 3/27/2017 judgment and the fraud upon the court perpetuated by **Michelle Murray and the**

**Women's Divorce and Family Law Group by Haid and Tiech LLP** which was aimed at covering up the scheme.

This overlap is why in Count I, II, III, & IV which is more heavily focused on the scheme to procure the 3/27/2017 judgement, there are references to **Attorney Dworkin's** actions and pleadings after she had been officially substituted out for **Attorney "Dworak" and others at Women's Divorce and Family Law Group by Haid and Tiech LLP**

It's important to reiterate that fact in this count, because as explained both were encouraged by **Judge Edward A. Arce**, who consciously or subconsciously ignored **Carleton B. Syph II's** warnings that a scheme was occurring, then admonished and had him arrested in part for proving it beyond a reasonable doubt.

11. While by no means should the arguments or the ideals expressed in this count be mistaken for excusing the attorney's from perpetuating a fraud upon the court. However; it's important to state the success of the frauds were to a large extent made possible by a judge lacking the impartiality expected of the judiciary. A judge who when presented with evidence informing him that **Michelle Murray and Attorney "Dworkin"** were refusing to satisfy his 6/7/2016 as part of a fraud aimed at circumventing **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2**, chose to ignore similar warnings of the fraud being perpetuated by **Michelle Murray and the Women's Divorce and Family Law Group by Haid and Tiech LLP** to cover it up.

12. Rather than reflecting even in the least bit a Judge standing straight up on the principles of justice and natural law, by ruling in a way that exalts truth and fidelity; no reasonable person would mistake the collection of rulings, in court statements nor conduct to reflect in the least bit that outlined in **Rule 62(A)**[8]. In fact, all of **Judge Edward A. Arce's** decisions and rulings before and even after the frauds were proven are overtly in favor of the party/parties who perpetuated the fraud in his court.

---

[8] **Rule 62(A)** A judge should respect and comply with the law and should conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

13. Once a lawyer accepts a retainer or engagement, they are obligated to ensure that the law is interpreted in a way most advantageous to their client, even if that interpretation contradicts their own personal views about how the law is applied. [9] Surely as alluded to in **Rule 1.16** and **Rule 4.1** a lawyer is equally obliged to proactively withdraw or terminate their relationship when their representation has been misused or begins to reflect a service in direct violation of the professional standards in place, as failure under the most profane circumstances subjects them to inquiry or worst. [10] [11] [12] However; in practice once the retainer is accepted the only way for anyone to believe that an attorney will be relieved of the responsibility of interpreting the law outside of what's best for their client, is if the judge relieves them of it by disqualification and/or sanction.

14. The previous paragraphs among other things is why I find it important to direct this tribunals attention to statements depicted below from a **MOTION TO DISQUALIFY, HOLD IN CONTEMPT AND/OR SANCTION COUNSEL** filed 7/12/2017 and

---

[9] **Preamble: a Lawyer's Responsibilities** [2]....As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system....

[10] **RULE 4.1** In the course of representing a client a lawyer shall not knowingly: **(a)** make a false statement of material fact or law to a third person; or **(b)** fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.

[11] **RULE 1.16 (b)** a lawyer may withdraw from representing a client if: **(2)** the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent; **(3)** the client has used the lawyer's services to perpetrate a crime or fraud;

[12]**Ill. R. Prof'l Conduct (2010) R.1.2 cmt. 11** (eff. Jan 1, 2016) When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer is required to avoid assisting the client, for example, by drafting or delivering documents that the lawyer knows are fraudulent or by suggesting how the wrongdoing might be concealed. A lawyer may not continue assisting a client in conduct that the lawyer originally supposed was legally proper but then discovers is criminal or fraudulent. The lawyer must, therefore, withdraw from the representation of the client in the matter. See Rule 1.16(a). In some cases, withdrawal alone might be insufficient. It may be necessary for the lawyer to give notice of the fact of withdrawal and to disaffirm any opinion, document, affirmation or the like. See Rule 4.1. In such situations, the lawyer should also consider whether disclosure of information relating to the representation is appropriate. See Rule 1.6(b).

**MOTION TO CONTINUE HEARING DATE JULY 28, 2017** filed 7/12/2017 **(See**

**Record Page C 1067 – C 1091** "Motions")

**(See Record Page C 1071 – C 1072)**

10) While a significant number of the improprieties and corresponding sanctions/remedies have been specifically laid out by me in petitions, motions and responses; there are a number of other acts and decisions were the distinction between the <u>business of litigation</u> and <u>professional misconduct</u> is less clear. While the latter can be pointed out by a prose

litigant or otherwise, I think it's fair to say that language like that in Rules 219 which in part states:

"...the court, upon motion or **upon its own initiative**, may impose upon the offending party or his or her attorney, or both, an appropriate sanction"

is intended to inform the public of the active role judges take in sanctioning a party and/or their attorneys for improprieties. Taking the initiative to sanction, especially when presented with evidence of professional misconduct committed against a prose litigant, does more for maintaining the trust in the judicial system than any solicited sanction ever will.

**(See Record Page C 1087)**

d) There is either no question or very little question presented by the opposing party that improprieties have occurred, felony perjury is just one of the many facts, that are supported by undeniable evidence. The main query up until recently, was focused on to distinguish those improprieties Michelle Murray and Sheryl Dworkin were jointly responsible for, from those which can be assigned to them separately. This distinction has recently become ever more complicated with the recent addition of **Women's Divorce & Family Law Group by Haid and Teich, LLP** (Michelle Dworak) and what appears to be her/their role in carrying on the same pattern of misconduct.

15. The arguments in the previous paragraphs along with previous depictions from pleadings,

serves to affirm that a trial court judge is not only obligated by the rules laid out in the

Code of Judicial Conduct, but is also empowered with tools necessary to preserve and

promote the impartiality of the judiciary in the eyes of the public. That said, this

affirmation should not be mistaken for a prose litigant attempting to bring attention to what

is already known by the judiciary, especially so for those at the highest level. Instead, if

presented correctly it should be received as evidence of a prose litigant believing it to be true.

16. The latter is of particular importance to the arguments in this pleading, because it's argued that **Michelle Murray and her attorney's** unabashed and rather audacious attempts to defile the court, was predicated on **Judge Edward A. Arce** openly proclaiming that he wasn't reading the arguments and corresponding evidence presented in the pleadings. These proclamations served as the primary source of the healthy level of skepticism Carleton B. Syph II maintained about the judge's impartiality, which was first mentioned in **Count IV** [13].

17. This proclamation by the judge was not made just once, but during several different court appearances between 5/20/2016 and 7/28/2017, including on the day of the 3/22/2017 hearing, when the judge again explained that he had not read the courtesy copies of the 2/9/2017 Motion to Compel, 2/9/2017 Motion to Strike the Motion to Compel or the 3/20/2017 Motion to Bar testimony he explained on 2/9/2017 he was going to decide on before the hearing.

(**See Record C 512** from "1/26/2017 Order")

③ Any further motions to be filed shall be
Attorney No. 32995    set, for the hearing date of 3/22/17.

(**See Record C 550** from "2/29/2017 Order")

---

[13] **Paragraph 100** "... the healthy level of skepticism  Carleton B. Syph II maintained about the judge's impartiality was to some extent cast aside, in exchange for a belief in an impartial judiciary"



Both motions are entered and continued to the previously scheduled hearing date of 3/22/17

18. It's comfortably believed that the proclamations made between 5/20/2016 and 3/22/2017 were not directly responsible for prompting **Michelle Murray and Attorney Dworkin** to tender two false financial affidavits and three false tax returns. However; it's reasonable to believe the judge's proclamation emboldened if not encouraged **Michelle Murray and her attorney's** to so crassly move forward as if they had not been provided with *indisputable* evidence that Michelle Murray had committed "Perjury" as outlined in **(735 ILCS 5/1-109)**[14] [15], not on just one Financial Affidavit but on both Financial Affidavits in efforts aimed at defeating a Petition to Modify a $500 per moth Child Support Order.

19. **Carleton B. Syph II** on the other hand for many reasons found the judge's open proclamations hard to believe. The most easily understood among them, is the fact that the judge includes a <u>COURTESY COPY RULE</u> in his standing order. As a litigant, a prose litigant at that, listening to the judge repeatedly explain that he was not reading the courtesy copies, his courtesy copy rule was entered to help facilitate, along with the fact that **Judge Edward A. Arce** explained that he'd expect a motion to bar **Michelle Murray and Attorney Dworkin** from testifying during the 3/22/2017 if they didn't satisfy his 6/7/2016 order, only to deny the motion to bar when presented to him, **Carleton B. Syph II** was

---

[14] **(735 ILCS 5/1-109)**...Any person who makes a false statement, material to the issue or point in question, which he does not believe to be true, in any pleading, affidavit or other document certified by such person in accordance with this Section shall be guilty of a Class 3 felony.

[15] **(730 ILCS 5/5-4.5-40)** CLASS 3 FELONIES; SENTENCE (a) TERM. The sentence of imprisonment shall be a determinate sentence of not less than 2 years and not more than 5 years.

left with few if any options more viable than penning the 5/12/2017 letter he sent to Chief Justice Evans. Along with it, as indicated in the letter was a black three ringed binder mailed via FedEx to the Chief Justice office; which included many of the courtesy copies **Judge Edward A. Arce** explained that he wasn't reading. **(See Exhibit B Chief Justice Letter).**

20. So, when **Judge Edward A. Arce** during a Friday afternoon 6/2/2017 emergency court appearance set by the **Attorney "Dworak" of the Women's Divorce and Family Law Group by Haid and Tiech LLP**, again explained that he had not even read the courtesy of copy of 5/2/2017 Motion to Reconsider that he was scheduled to enter a ruling on the Monday morning of 6/5/2017, it became ever more challenging for **Carleton B. Syph II** to not immediately consider these assertions by the judge to reflect, either a biasness in direct contrast to **Ill. S. Ct. R. 62(A)** and/or evidence of the Judge's inability to manage the administrative responsibilities of his court as outlined in **Ill. S. Ct. R. 63(B)**.

21. Either way, when one considers that **Judge Edward A. Arce** was telling the opposing party that he was <u>not</u> reading the pleadings and supporting evidence, which began to inform the court about the possibility of fraud as early as 9/9/2016 before finally proving it beyond a reasonable doubt by 6/5/2017, while not excusing counsel's efforts in assisting with fraudulent acts, its rather easy to understand their reason for going forward with helping their client commit a fraud upon the court.

22. It's argued that the confidence to move forward with the scheme; which started with efforts aimed at circumventing **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2** by false pretense, escalated to efforts aimed at intimidating **Carleton B. Syph II** from conducting the discovery which would prove it, before finally graduating into efforts

focused on covering up the crimes, was heavily based on the judge's open proclamation
that he was not looking at the evidence of the scheme while it was occurring.

**(See Record Page C 1067 – C 1091)** // ~~mAcoD~~ ~~t.~~~~7(~~~~c~~~~'~~

> A scheme which is predicated on an idea that the
> circuit court is so overburden, that it is unable to keep track of who was heard when,
> and what was decided. One where an officer of the court entrusted by the judge to
> maintain the integrity of the justice system, misuses that trust to mislead the judge
> into believing <u>alternative facts</u>.

23. In addition to my words included in this pleading, one needs to only consider the Judge's
own words to back up my assertions about him openly proclaiming that he wasn't reading
the courtesy copies of the pleadings and evidence presented to him.

**7/28/2017** hearing page 56 lines 12 - 13

```
12        THE COURT:  A pleading is a pleading.  He can
13   put anything that he wants in a pleading.
```

24. When you consider the above statement along with the fact that most every pleading filed
under 12D009167 is certified under **(735 ILCS 5/1-109)**, the sentiments expressed by the
judge are indicative of an indifference toward the truth and evidence expected to be
presented in pleadings.

25. To understand the point being made here, I suggest that it would not have been all that
different if the judge would have said *"An affidavit is an Affidavit. He can put anything
that he wants in an Affidavit."* As the same **(735 ILCS 5/1-109)** Certification used to assert
the trust worthiness of the two false Financial Affidavits tendered by **Michelle Murray
and Attorney Dworkin**, was/is used to certify the trust worthiness of the pleadings.

26. In addition to considering the judge's cavalier perception of the **(735 ILCS 5/1-109)** Certification listed on just about every pleading as reason to believe me, when I say the judge was deliberately ignoring the clear evidence of perjury and fraud when making his rulings; I argue for a judge to openly proclaim that a litigant can put *"anything that he wants in a pleading"*, essentially makes the entire **Ill. S. Ct. R. 137** sanction obsolete. [16]

27. Maintaining such a position on the most basic of levels encourages slander, on the next level up it allows the type of harassing litigation waged by **Michelle Murray** against citizens of the state of Illinois, which is complemented by granting a license to the legal profession to not only vexatiously multiply proceedings, but help their clients commit perjury and fraud when doing so. For how can one prove perjury and fraud in any case not to mention a Domestic Relations proceeding, if it's not in and by the pleadings filed?

28. I argue in advance that the Judge's words were not taken out of context, by providing the following statements made by the judge on 9/18/2016.

**ROP 9/18/2017 hearing page 15**

---

[16]Rule 137 permits the circuit court to impose sanctions on a party or attorney for "filing a pleading, motion, or other paper that is not well grounded in fact and warranted by existing law or which has been interposed for any improper purpose." In re Marriage of Adler, 271 Ill. App. 3d 469, 476 (1995). The purpose of the rule is to discourage the pleading of frivolous or false matters and the assertion of claims without any basis in the law, by penalizing attorneys and parties who engage in such conduct. Baker v. Daniel S. Berger, Ltd., 323 Ill. App. 3d 956, 963 (2001).

```
18                    Let's assume that everythign you said
19   to me is true.  Maybe I can sanction her for
20   providing false documents.  I'm not saying I can or
21   I can't.  But that's a sanction issue.  These are
22   all -- what we are here for today is a purge of your
23   contempt.
```

29. I first point to the 60+ pages of transcripts, then to the 9/18/2017 Order itself (**See Record Page C 1127** "Order") to highlight the 7 if not 8 decisions the judge was being asked to make and did eventually make that day.

30. Second, so much of what I said had been proven true by *indisputable and undisputed* evidence included in the pleadings, there was no need to assume anything was true.

31. Third, I argue that it's reasonable to consider the Judge's statements on 7/28/2017 where in which he explains that *a pleading is just a pleading*, along with the expressed reluctancy to sanction the opposing party on 9/18/2017 as depicted above, is either evidence of a lack of impartiality that brings the judiciary in disrepute or logic compass which surely cannot be mistaken for promoting public confidence in the integrity of the judiciary as outlined in **Ill. S. Ct. R. 62(A).**

32. To understand the point being made here, **Judge Edward A. Arce** statements on 7/28/2017 and 9/18/2017 would be the equivalent to the S.E.C explaining to group of disgruntled investors.

> *"Let's assume everything you're saying is true. This Corporation filed false financial statements and the public accountant firm hired to audit those financial statement, helped them do it. Maybe we can hold the corporate officers and*

> *auditing firm responsible for the fraud. We're not saying that we can, or we can't but that's a crime, what does that have to do with financial hardship you're complaining about.*

33. This is especially true when you consider **Judge Edward A. Arce** was willing to considered entering **Ill. S. Ct. R. 137**sanctions against Carleton B. Syph II, for proving beyond a reasonable doubt, what he suggested the parties assume to be true to make his point.

34. If evidence supporting the opposing party committed perjury and fraud leading up to the 3/22/2017 hearing, by tendering 2 false Financial Affidavits and filing 3 false Tax Returns whether it be in "its proven form or the assumed to proven be form" played no role in the Judge's decisions entered on 3/22/2017 and affirmed on 7/28/2017, it's reasonable to ask what did? There's no need to guess, **Judge Edward A. Arce** tells you

   **9/18/2017 hearing page 15**

```
 1   the -- what Ms. Murray or whatever documents you
 2   offered with respect to Ms. Murray or were unable to
 3   offer because it didn't comply with the rules -- to
 4   really be relevant for this reason.  The petition
 5   that you filed is based on a substantial change of
 6   circumstances as it related to you, and that was the
 7   petition you filed.
 8                    It really had nothing to do with her.
 9   So when we had our hearing, it was your burden to
10   establish that you had a substantial downturn in
11   business.  I think your allegation was you lost a
12   big customer, and I recall that you had no evidence
13   of it at all.  So, therefore, I denied your
14   petition.
```

35. Without rehashing the preponderance of truthful, verifiable and never sufficiently challenged evidence proving that a change in Carleton B. Syph II's circumstance had in fact occurred, as well as the Judges own words written in the 3/27/2017 judgment which completely contradicts his statements that **Carleton B. Syph II** had "no evidence at all" to prove it, I instead direct the courts attention to his 5/20/2016 Petition to Modify Child Support, as it states clearly as shown below.

PETITION FOR MODIFICATION OF CHILD SUPPORT

**(Record Page C 323)**

5. Since the entry of this Order, there have been substantial changes in circumstances which justify the immediate modification of the Child Support order & Related Expense including:

**WHEREFORE, I request:**

That the Court ____ increase _X_ decrease the existing level of Child Support & Related expense in order reflect the changes in the parties' obligations, conditions, and abilities to support the minor child.

Carleton B. Syph II

Under penalties as provided by law pursuant to Section 5/1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Carleton B. Syph II

36. Unlike **Michelle Murray and Attorney Dworkin**, **Carleton B. Syph II** has neither the resources to hire private investigators nor the desire to be following Michelle Murray around to try and "scam" her into providing evidence to support a change in her circumstances **(See Record Page C 902** "Dworkin Invoice for Scamming"**)**.

| ~/2013 | Drafted the Petition for Contempt and sent to Michelle after speaking to her, to IDES (which would not confirm unemployment benefits), Sandy Smith (colleague who will call Michael and scam him) | | 1.43333 | 275.00 | 394.17 | |
|---|---|---|---|---|---|---|

37. Instead, as a matter of preserving his Petition to Modify Child Support which on 7/7/2016 **Michelle Murray and Attorney Dworkin** moved to strike, **Carleton B. Syph II** provided the only verifiable evidence of a change in circumstances at that time; which was an email from one of his customers. It's argued here, that providing the only verifiable change in circumstances, did not, as alluded to by **Judge Edward A. Arce** on 9/18/2017 forfeit **Carleton B. Syph II's** nor the courts' right to consider a change in Michelle Murray's financial circumstances when determining if a modification was warranted.

38. In fact, **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2;** which requires an "exchange of financial disclosure" when modifying post decree, is intended to insure, as indicated in **(750 ILCS 5/505)** *"(a) both parents owing a duty of support to a child"* that the financial circumstances of both parents are taken into consideration.

39. To understand the point being made here, assume the shoes were on the other foot.

40. Let's say, when the child support order was entered for case 12D009167 in 2013, **Carleton B. Syph II** was working form 2:00pm to 10:00pm Monday - Friday as a pizza delivery man who drove a Ford Pinto. Then one Wednesday evening at about 9:30 pm, **Michelle Murray** saw him out driving a 600 Mercedes Benz. She'd have a right to file a petition seeking to modify **Carleton B. Syph II's** child support order, citing a "change in circumstances".

41. Upon doing so, in line with **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2** the judge orders an exchange of Financial Affidavits and Tax Returns. **Michelle Murray** provides **Carleton B. Syph II** with a Financial Affidavit and Tax Return showing that her Gross income in 2016 was basically the same as it was in 2013. Then **Carleton B. Syph II** provides a Financial Affidavit and Tax Return to **Michelle Murray** showing that his gross income in 2016 was basically the same as it was when the child support order was entered in 2013. **Michelle Murray** begins to conduct discovery, to determine how **Carleton B. Syph II** could afford a 600 Mercedes Benz payment on income equivalent to what he was making as a pizza delivery man, and why he hadn't included the 600 Mercedes Benz as an asset or liability on his Financial Affidavit. Responding to that discovery, **Carleton B. Syph II** provides evidence that he changed careers and now works Monday -

Friday 5:00pm and 10:00pm as a valet driver, and the reason why he didn't list the 600 Mercedes Benz as an asset or liability is because he doesn't own one.

42. The collection of financial information would be valid reason to deny **Michelle Murray's** petition to increase **Carleton B. Syph II** child support obligation.

43. However; if upon conducting discovery **Michelle Murray** finds out that **Carleton B. Syph II** does own a 600 Mercedes Benz and rather than working as a valet driver, the Financial Affidavit and the Tax Returns he tendered to her were false; as they failed to include account balances and income from a winning lottery ticket he used to open a chain of valet companies. Then after verifying all of that, **Michelle Murray** argues that **Carleton B. Syph II** committed felony perjury and tax fraud, in order to circumvent **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2;** the fact that **Carleton B. Syph II's** child support obligation would most likely increase, should be the least of his worries. Right?

44. While neither is advisable, the IRS is most likely going to fine and make him pay the missing taxes. The judicial system on the other hand, both assigned the consequences for violating the **(735 ILCS 5/1-109)** Certification and then ensured to include the **(735 ILCS 5/1-109)** Certification next to the signature on the Financial Affidavit to prevent everything we're going through right now. When I say we're, I'm referring to **Carleton B. Syph II**, as well as the Cook County and State Courts.



45. While it's argued that Judge's statement "that a pleading is a pleading he can put anything he wants in a pleading" reflects a cavalier perception of why there is a (**735 ILCS 5/1-109**) Certification in the first place, that statement it's no less true than the fact that a person can sell any type of drugs they want to, they can steal as many cars as they want to and they can rob as many banks as they want to, too. However; if they get caught there are consequences associated with those decisions and actions. It's for those reasons, the and consequences attached to the crimes that is, that I find it so astonishing, that the opposing party who has at all times been represented by competent counsel, would be going out of their way to escalate the issue to this level.

46. As indicated before this should not be mistaken for a prose litigant informing people who do this for a living, that this is how the law works. However; the audacity to so rigorously

attack **Carleton B. Syph II** petitions, with the proven perjury and fraud which not only qualifies as a Class 3 Felony but violates a litany of professional conduct standards can only be reasonably described as flaunting. That said, the previous example and to some extent this entire pleading can be attributed to **Michelle Murray and her attorney's** total disregard for the written consequences; emboldened by a Judge openly proclaiming that he was ignoring the evidence of their perjury and fraud. The latter of which; is easily understood as communicating in advance that he wouldn't hold them responsible for it. That's why it's reiterated here that while nothing included in this pleading nor any other should be mistaken as an attempt to excuse **Michelle Murray and her attorneys** of the consequences, the judge's conduct mentioned in this count served as a license for them to commit perjury and fraud in his court.

47. Just as **Judge Edward A. Arce** explained on 9/18/2017 that 'sanctions' was an option that was available to him when presented with clear evidence of the perjury and fraud. The option to find **Michelle Murray** in indirect criminal contempt as **Carleton B. Syph II** in line with **Cook Co. Cir. Ct. R. 13.8(a)(i)**[17] requested in writing on 5/12/2017. This is especially true considering **Judge Edward A. Arce** granted **Michelle Murray and her attorneys'** an *oral motion* for leave to file for a direct criminal contempt number on 12/21/2017 as depicted below, without them providing any evidence of **Carleton B. Syph II** violating any valid order or law.

---

[17] **(i) Initiation** - All requests for Rule to Show Cause, Adjudication of Indirect Criminal Contempt or Indirect Civil Contempt must be in writing, must specifically identify the order or provision alleged to have been violated, and must be properly served on the responding party.

```
11          And the other thing I'd be asking for today
12     and I've raised this briefly -- but your Honor said
13     we couldn't discuss it, because you had just taken
14     him into custody -- I would ask for leave to file
15     for direct criminal contempt for failure, in
16     particular, to turn over documents that I believe
```

```
9          With respect to the criminal contempt, I'll
10     give you leave to get a criminal contempt number.
```

48. To continue the arguments before the example, I state to interpret a petition which clearly states that *"a change in circumstances"* has occurred and asks the court to decrease the existing level *"in order to reflect the parties' obligation, conditions and abilities to support the minor child"*, as one which restricts both the litigant and the court from considering the financial circumstances of the both parents as suggested by the judge on 9/18/2017 and depicted in **paragraph 81**, is at best evidence supporting what the judge had openly proclaimed many times; which was that he was not reading the pleadings and evidence being presented to him.

49. While as explained before, that due to the COURTESY COPY RULES written in his standing order, **Carleton B. Syph II** never believed that **Judge Edward A. Arce** wasn't reading the courtesy copies which included the evidence of the fraud being provided to him; the words shared by the Judge during a hearing held on 3/30/018, is not only additional evidence supporting why he should not have believed him, but is indicative of the double talk deliberation **Carleton B. Syph II** has been subjected to in case 12D009167 since the beginning of 2013. The only difference in the deliberation between 1/1/2012 and

12/31/2015 and those exhibited between 5/26/2016 and 3/30/2018, is that court transcripts prove the latter.

50. To back up that argument consider

### 3/30/2018 Transcripts page 24 & 25

```
22        THE COURT:  And the order you refer to, because I
23  don't know what you're referring to.
24        MR. ELSTER:  There's the October 27th, 2015 agreed
```

```
1  order which -- bear with me for one second.  Paragraph
2  nine, I'm tendering a copy to the Court, sets forth the
3  $573 a month obligation.  And if your Honor looks past
4  paragraph nine to paragraph 11, Mr. Syph's failure to
5  make those monthly payments results in what amounts to
6  a balloon payment of the arrearages at the time.
```

**51.** What the transcripts can't show, is from the time **Judge Edward A. Arce** is handed a copy of the order underlined in the above depiction, including during **Carleton B. Syph II's** attempts to clarify, understand and explain, before finally being threatened with incarceration for trying to do so as depicted below.

```
12      THE COURT:  Mr. Syph.

13      MR. SYPH:  Well, I think as it relates to child

14 support, I was held in -- I was taken into custody on

15 October -- I mean, December 2012 for not paying $2,000

16 in child support, which was to cover August,

17 September -- September, October, November and December.

18 I paid that $2,000 to be released from custody.

19          On the next day after being released from

20 custody I paid $2,000 more.  On December 21st, 2017 I

21 explained to the Judge that -- well, I guess it was

22 the -- I don't know if it was the bond date or the

23 status date following my release, that if you turned

24 over the bond fund to the opposing party, that I would
```

**3/30/2018 Page 26**

1 then be ahead by my child support by exactly $2,000 as

2 of today, so I paid that $2,000.

3      THE COURT: How could that be possible? You mean

4 you paid the $10,000 arrears plus kept current,

5 because -- excuse me. I'm going to finish a sentence.

6 You're not going to interrupt me.

7           Didn't I enter an order in March 2017 that

8 said you were behind approximately $10,000? Am I

9 remembering that correctly?

10     MR. ELSTER: I believe it was --

11     THE COURT: I'm talking to Mr. Syph.

12     MR. SYPH: So the purge was originally --

13     THE COURT: I'm not asking you what the purge was.

14 I'm asking you, am I correct that you owe $10,000 in

15 March of 2017 as arrears?

16     MR. SYPH: No, I don't agree with that.

17     MR. ELSTER: If I may, Judge. It was $17,113.13

18 pursuant to paragraph 16.

19     THE COURT: So 17,000. So you've paid -- because

20 according to you, you just said you're $2,000 ahead.

21 So you've paid $17,000 in arrears plus kept current?

22     MR. SYPH: I was taken into custody.

23     THE COURT: No. You're going to answer my

24 question. You're not going to give me a speech.

**3/30/2018 Page 27**

```
1      MR. SYPH:  Well, I understand that, Judge, but I'm
2  trying to get an understanding of what --
3      THE COURT:  Excuse me.  You said you were $2,000
4  ahead, which means you've overpaid.
5      MR. SYPH:  Right, of my current child support
6  obligation, which is why I was taken into custody.
7      THE COURT:  Don't say anything else because I don't
8  want to take you in again.  It's Friday, it's a holiday
9  weekend, before you say something ridiculous.
```

**Carleton B. Syph II** was watching **Judge Edward A. Arce** thumb through the October 27th, 2015 order handed to him, as if as explained by the judge below.

**3/30/2018 Transcript Page 40**

```
        I don't remember ever seeing it before.  This
5  was done before I took over this call.  It was entered
6  by Judge Murphy back in 2015.  And there was a finding
7  of an arrears in this document, which is different from
8  the number I found.
```

52. To understand the significance of this revelation of the depiction directly above and what role it has played in escalating the proceedings in case 12D009167 to this level, it serves this court well to know that all of **Judge Edward A. Arce's** rulings, in court statements and questioning between 3/22/2017 and 3/30/2018 including those surrounding his

$8,797.77 judgement for attorney fees, have been conveyed as if as he had never seen the October 27th, 2015 order before.

53. One needs only to consider **Judge Edward A. Arce's** open proclamations that he wasn't reading the courtesy copies of the pleadings which included evidence of perjury and fraud, the fact that he was deliberating on the issues under the pretense that he had never seen the 10/27/2015 order before, along with the fact as depicted below the Judge makes no less than 5 different references to the 10/27/2015 order in his written 3/27/2017 judgement, to understand **Carleton B. Syph II's** reasoning for trying to gain a better understanding of why the judge was deliberating on the matter in the way in which he had.

17. Husband has failed to establish that there was a reasonable cause or justification for his failure to comply with the Agreed Order of October 27, 2015. Husband's conduct has defeated and impaired the rights and interests of the Wife.

14. Husband similarly failed to comply with the provision of the Agreed Order of October 27, 2015 that he pay $573.00 towards the arrears of $17,413.43. *Petitioner's Ex. #10* Pursuant to the November 3rd Order, the balance remaining due and owing pursuant to the October 27th Agreed Order was $11,620.68 exclusive of interest.

5. Neither the Judgment for Dissolution of Marriage or the Agreed Order of October 27, 2015 contain findings as to Husband's net income or a finding that the support, as ordered, is based upon statutory guidelines. If the guideline was applied, the $500.00

3. An Agreed Order was entered on October 27, 2015 which is incorporated herein as if set forth verbatim. In part, the Agreed Order provided that Husband continue to pay the sum of $500.00 per month in current child support and an additional $573.00 per month towards an accumulated arrears for child support, school tuition, child care, speech therapy, Husband's portion of medical expenses, medical and dental insurance premiums and summer camp. *Petitioner's Ex. #10*.

> F. Pursuant to the Agreed Order of October 27, 2015, a judgment is entered in favor of Petitioner Michelle Murray and against Respondent Carleton Syph Jr. in the amount of \$1,344.96 representing attorney's fees pursuant to Paragraph 12 therein.

54. Those facts are what prompted **Carleton B. Syph II** to try and clarify his rulings as depicted below. As he's trying to understand among other things how the Judge can could possibly be trying to tell him that his 3/27/2017 order was neither based off of nor considered the 10/27/2015 order, when within the 3/27/2017 order he extensively wrote about the 10/27/2015 order.

### 3/30/2018 Page 41

```
 2      MR. SYPH:  So the arrearage is based on a decision
 3 to include a marital expense as child support.
 4      THE COURT:  No, absolutely not.  The payment that
 5 I'm requiring you to make that you should have paid
 6 over the course of time according to an order that was
 7 entered on October of 2015, you owed $17,400 and the
 8 order that I entered said that you owed $17,000.
 9           Excuse me.  You asked me a question:  I'm
10 going to give you an answer.  Then I'm going to say
11 goodbye.
12           I'm not sure the period -- the periods that
13 were covered, the Department of Health and Family
14 Services is going to do the calculation based on the
15 court orders that have been entered not just by myself,
16 but by Judge Ruble-Murphy.
```

55. The expense in question was paid for between 2011 & 2013 with marital property accumulated during that time. As first explained in a Motion to Vacate filed 3/20/2017 **(See Record C 551 – C 554** "Vacate"), then more clearly explained in a Motion to Reconsider filed 5/2/2017 **(See Record Page C 774 – C 775** "Reconsider") and alluded to in an email sent to the WOMAN'S DIVORCE & FAMILY LAW GROUP **(See Record Pages C 1009 – C 1018** "Email"), had **Michelle Murray and Attorney Dworkin** not conspired to hide the marital assets **Carleton B. Syph II** sought in his 2013 discovery requests leading up to the marriage dissolution hearing, in much of the same way as outlined in Count I, II & III of this pleading which they were ordered to furnish in the days leading up to the 3/22/2017 hearing to Modify Child Support, there would not have been a **section 4.4 (c)** portion of the 7/22/2014 judgement or it would have been one more equitably distributed.

56. It's fitting to conclude this pleading by affirming, while **Carleton B. Syph II** efforts in case 12D009167 between 5/26/2016 through 6/7/2018 have always been narrowly focused on relying on verifiable evidence to pursue a Modification of his child support order in accordance with the **(750 ILCS 5/505)** and **Cook Co. Cir. Ct. R. 13.3.1(b)** and **Cook Co. Cir. Ct. R. 13.3.2(a)**; it is again proven, that the opposing side has been willing to unabashedly violate many state and federal laws, professional conduct and circuit court rules in efforts to intimidate and defeat **Carleton B. Syph II** pursuit of justice. In fact, all movements presented by **Carleton B. Syph II** in any pleadings which request a reprimand of any sort, have been in response to **Michelle Murray and her attorneys** using the proven perjury and fraud to pursue contempt and sanctions against him for proving it. As peculiar as the previous statement may sound, it was **Judge Edward A. Arce's**

willingness to entertain and to some degree encourage their efforts; which elevates the

severity of the improprieties to a level which requires this court's intervention.

Name Under the penalties as provided by law pursuant to Section 5/1-109 of the Code of Civil

Procedure, the undersigned certifies that the statements set forth in this instrument are true and

correct, except as to matters therein stated to be on information and belief and as to such matters

the undersigned certifies as aforesaid that she/he verily believes the same to be true.

Print: __Carleton B. Syph II__ Signature:_____ Date: __6/05/2018__

# Exhibit B

"Order Sealing and Impounding on 2/1/2018 and baring pleadings on 3/30/2018"

Order                                                    (Rev. 02/24/05) CCG N002

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

In re the Former Marriage of:

MICHELLE MURRAY

v.           Petitioner          No.  12 D 1167

                                 cal. 63

CARLETON R. YRH II

              Respondent

**ORDER**

This motion having come before the court on
Petitioners Emergency Motion to clarify and Enforce
Court orders, counsel for Petitioner present, petitioner
present, Respondent not present, and the court
being advised in the premises. IT IS
HEREBY ORDERED:

1 The Emergency Motion is granted.
2 The Court files And All Documents are Sealed and impounded
pursuant to the previous orders entered June 29
2018 and November 16, 2018.

Attorney No.: 57650
Name: Womens Divorce + Family Law Group   **ENTERED:**
Atty. for: Petitioner
Address: 333 S. Wacker Drive 84th Fl.   Dated: _____   Judge Edward A. Arce
City/State/Zip: Chicago, IL 60606                          FEB - 1 2018
Telephone: 312 - 445 - 8830                          Circuit Court – 1980
                                      Judge           Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**



**ORDER**

CCG-N002

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Michelle Murray

v.

Carleton Syph

NO. 17 D 9167

cal 63

### ORDER (1/2)

This cause coming to be heard for hearing pursuant to 12/21/17 and 2/13/18 orders, both parties appearing in person and Petitioner appearing through counsel, the Court having heard testimony and argument, and being fully advised, it is hereby ordered that:

1. Respondent's motion to Set Aside 3/13/17 Judgment is dismissed with prejudice, for the reasons stated on the record.

2. Respondent's 2-616 motion to Amend said Petition is denied.

3. Respondent's 2-1001 (a)(4) motion to Disqualify Judge Area is denied for the reasons stated on the record.

4. Michelle's "Petition to Require Respondent to Obtain Leave of Court..." is GRANTED. Prior to Filing any document with this Court, Respondent shall first present the same to Judge Area and must obtain written permission to file and serve such document.

| | |
|---|---|
| **Atty No.** | 80095 |
| **Name** | Beermann Pritikin Mirabelli Swerdlove LLP |
| **Attorney for** | |
| **Address** | 161 N. Clark Street, Suite 2600 |
| **City/ Zip** | Chicago, Il 60601 |
| **Telephone** | 312-621-9700 |

_____, 20 ___

**ENTER:**

_____
**Judge    Judge's No.**



**ORDER**

CCG-N002

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

MICHELLE MURRAY

v.

CARLETON SYPH

NO. 12 D 9167

CAL 63

ORDER (2/2)

5. Respondent shall pay the sum of $300 per month to Petitioner as and for payment towards his existing support arrearage.

6. IDHFS is ordered to perform an account adjustment review in order to determine the amount of Respondents support arrearage.

7. Hearing on Michelles 6th Petition for Rule to Show Cause, 2nd Motion for Sanctions, and Petition for Attorney's Fees shall be held on June 7, 2018 at 11:30AM

8. All ~~purposes~~ of ~~all prior~~ order not ordered herein shall ~~remain in~~ full ~~force and effect~~

9. Status on IDHFS account adjustment review, ~~issuance~~ of sanctions per 9/14/17 order, and all other pending matters shall occur on said June 7, 2018 date.

| Atty No. | 80095 |
|---|---|
| Name | Beermann Pritikin Mirabelli Swerdlove LLP |
| | M. Elster |
| Attorney for | Michelle Murray |
| Address | 161 N. Clark Street, Suite 2600 |
| City/ Zip | Chicago, Il 60601 |
| Telephone | 312-621-9700 |

Judge Edward A. Arce , 20

ENTERED    MAR 30 2018

Circuit Court – 1980
Judge        Judge's No.

# Exhibit C

Support Payments and Accruals

| Collection Date: | Amount | balance | work Group |
|---|---|---|---|
| 1/1/2013 | $ 500.00 | $ 500.00 | 7/22/2014 retroactive accrual |
| 2/1/2013 | $ 500.00 | $ 1,000.00 | 7/22/2014 retroactive accrual |
| 3/1/2013 | $ 500.00 | $ 1,500.00 | 7/22/2014 retroactive accrual |
| 4/1/2013 | $ 500.00 | $ 2,000.00 | 7/22/2014 retroactive accrual |
| 5/1/2013 | $ 500.00 | $ 2,500.00 | 7/22/2014 retroactive accrual |
| 6/1/2013 | $ 500.00 | $ 3,000.00 | accrual |
| 7/1/2013 | $ 500.00 | $ 3,500.00 | accrual |
| 8/1/2013 | $ 500.00 | $ 4,000.00 | accrual |
| 8/6/2013 | $ (500.00) | $ 3,500.00 | 444906 |
| 9/1/2013 | $ 500.00 | $ 4,000.00 | accrual |
| 9/5/2013 | $ (500.00) | $ 3,500.00 | 456052 |
| 10/1/2013 | $ 500.00 | $ 4,000.00 | accrual |
| 10/17/2013 | $ (1,500.00) | $ 2,500.00 | in order |
| 11/1/2013 | $ 500.00 | $ 3,000.00 | accrual |
| 11/15/2013 | $ (250.00) | $ 2,750.00 | 420794 |
| 12/1/2013 | $ 500.00 | $ 3,250.00 | accrual |
| 12/31/2013 | $ (300.00) | $ 2,950.00 | 440258 |
| 1/1/2014 | $ 500.00 | $ 3,450.00 | accrual |
| 1/24/2014 | $ (950.00) | $ 2,500.00 | in order |
| 2/1/2014 | $ 500.00 | $ 3,000.00 | accrual |
| 2/10/2014 | $ (500.00) | $ 2,500.00 | 457611 |
| 3/1/2014 | $ 500.00 | $ 3,000.00 | accrual |
| 3/29/2014 | $ (500.00) | $ 2,500.00 | 411640 |
| 4/1/2014 | $ 500.00 | $ 3,000.00 | accrual |
| 4/17/2014 | $ (500.00) | $ 2,500.00 | in order |
| 5/1/2014 | $ 500.00 | $ 3,000.00 | accrual |
| 6/1/2014 | $ 500.00 | $ 3,500.00 | accrual |
| 7/1/2014 | $ 500.00 | $ 4,000.00 | accrual |
| 7/11/2014 | $ (250.00) | $ 3,750.00 | 446773 |
| 7/26/2014 | $ (250.00) | $ 3,500.00 | 415691 |
| 8/1/2014 | $ 500.00 | $ 4,000.00 | accrual |
| 8/11/2014 | $ (500.00) | $ 3,500.00 | 416169 |
| 8/22/2014 | $ (250.00) | $ 3,250.00 | 448329 |
| 8/29/2014 | $ (250.00) | $ 3,000.00 | 421141 |
| 9/1/2014 | $ 500.00 | $ 3,500.00 | accrual |
| 9/9/2014 | $ (800.00) | $ 2,700.00 | in order |
| 10/1/2014 | $ 500.00 | $ 3,200.00 | accrual |
| 10/7/2014 | $ (1,000.00) | $ 2,200.00 | 437604 |
| 11/1/2014 | $ 500.00 | $ 2,700.00 | accrual |
| 12/1/2014 | $ 500.00 | $ 3,200.00 | accrual |
| 12/11/2014 | $ (500.00) | $ 2,700.00 | 442316 |
| 12/19/2014 | $ (250.00) | $ 2,450.00 | 430090 |
| 1/1/2015 | $ 500.00 | $ 2,950.00 | accrual |
| 1/12/2015 | $ (500.00) | $ 2,450.00 | 411136 |
| 1/26/2015 | $ (350.00) | $ 2,100.00 | 451130 |

| Date | Amount | Balance | Note |
|---|---|---|---|
| 2/1/2015 | $ 500.00 | $ 2,600.00 | accrual |
| 2/11/2015 | $ (250.00) | $ 2,350.00 | 444191 |
| 2/25/2015 | $ (800.00) | $ 1,550.00 | 432353 |
| 3/1/2015 | $ 500.00 | $ 2,050.00 | accrual |
| 4/1/2015 | $ 500.00 | $ 2,550.00 | accrual |
| 4/2/2015 | $ (1,800.00) | $ 750.00 | 445769 |
| 5/1/2015 | $ 500.00 | $ 1,250.00 | accrual |
| 6/1/2015 | $ 500.00 | $ 1,750.00 | accrual |
| 6/20/2015 | $ (1,000.00) | $ 750.00 | 436235 |
| 7/1/2015 | $ 500.00 | $ 1,250.00 | accrual |
| 8/1/2015 | $ 500.00 | $ 1,750.00 | accrual |
| 8/31/2015 | $ (1,900.00) | $ (150.00) | in order |
| 9/1/2015 | $ 500.00 | $ 350.00 | accrual |
| 10/1/2015 | $ 500.00 | $ 850.00 | accrual |
| 10/27/2015 | $ (2,000.00) | $ (1,150.00) | in order |
| 11/1/2015 | $ 500.00 | $ (650.00) | accrual |
| 12/1/2015 | $ 500.00 | $ (150.00) | accrual |
| 12/10/2015 | $ (1,000.00) | $ (1,150.00) | 432413 |
| 1/1/2016 | $ 500.00 | $ (650.00) | accrual |
| 1/15/2016 | $ (500.00) | $ (1,150.00) | 446006 |
| 2/1/2016 | $ 500.00 | $ (650.00) | accrual |
| 2/13/2016 | $ (500.00) | $ (1,150.00) | 412710 |
| 3/1/2016 | $ 500.00 | $ (650.00) | accrual |
| 3/17/2016 | $ (500.00) | $ (1,150.00) | 448228 |
| 4/1/2016 | $ 500.00 | $ (650.00) | accrual |
| 4/18/2016 | $ (500.00) | $ (1,150.00) | 449324 |
| 5/1/2016 | $ 500.00 | $ (650.00) | accrual |
| 5/16/2016 | $ (500.00) | $ (1,150.00) | 437525 |
| 6/1/2016 | $ 500.00 | $ (650.00) | accrual |
| 7/1/2016 | $ 500.00 | $ (150.00) | accrual |
| 8/1/2016 | $ 500.00 | $ 350.00 | accrual |
| 9/1/2016 | $ 500.00 | $ 850.00 | accrual |
| 10/1/2016 | $ 500.00 | $ 1,350.00 | accrual |
| 11/1/2016 | $ 500.00 | $ 1,850.00 | accrual |
| 11/3/2016 | $ (2,438.75) | $ (588.75) | Total of turn over of funds entered by Judge Kubasiak on 11/3 which was intended to be applied to child support. |
| 12/1/2016 | $ 500.00 | $ (88.75) | accrual |
| 1/1/2017 | $ 500.00 | $ 411.25 | accrual |
| 2/1/2017 | $ 500.00 | $ 911.25 | accrual |
| 3/1/2017 | $ 500.00 | $ 1,411.25 | accrual |
| 4/1/2017 | $ 500.00 | $ 1,911.25 | accrual |
| 5/1/2016 | $ 500.00 | $ 2,411.25 | accrual |
| 5/1/2017 | $ (735.00) | $ 1,676.25 | 410443 |

| Date | Amount | Balance | Reference |
|---|---|---|---|
| 6/1/2017 | $ 500.00 | $ 2,176.25 | accrual |
| 7/1/2017 | $ 500.00 | $ 2,676.25 | accrual |
| 8/1/2017 | $ 500.00 | $ 3,176.25 | accrual |
| 8/9/2017 | $ (1,000.00) | $ 2,176.25 | 509011 |
| 9/1/2017 | $ 500.00 | $ 2,676.25 | accrual |
| 9/14/2017 | $ (500.00) | $ 2,176.25 | 434266 |
| 9/25/2017 | $ (2,000.00) | $ 176.25 | 2018_3_15payments FOR 2017.pdf |
| 10/1/2017 | $ 500.00 | $ 676.25 | accrual |
| 11/1/2017 | $ 500.00 | $ 1,176.25 | accrual |
| 12/1/2017 | $ 500.00 | $ 1,676.25 | accrual |
| 12/7/2017 | $ (76.25) | $ 1,600.00 | 44928 |
| 12/14/2017 | $ (2,000.00) | $ (400.00) | 2018_3_15payments FOR 2017.pdf |
| 1/1/2018 | $ 500.00 | $ 100.00 | accrual |
| 1/15/2018 | $ (2,000.00) | $ (1,900.00) | nd turnover evidence_1_16_2018.p |
| 2/1/2018 | $ 500.00 | $ (1,400.00) | accrual |
| 2/5/2018 | $ (500.00) | $ (1,900.00) | 427017 |
| 2/26/2018 | $ (500.00) | $ (2,400.00) | 2018_3_15payments FOR 2018.pdf |
| 3/1/2018 | $ 500.00 | $ (1,900.00) | accrual |
| 3/12/2018 | $ (100.00) | $ (2,000.00) | 415885 |
| 3/19/2018 | $ (500.00) | $ (2,500.00) | 428296 |
| 3/23/2018 | $ (100.00) | $ (2,600.00) | verfied dfhs |
| 4/1/2018 | $ 300.00 | $ (2,300.00) | accrual |
| 4/1/2018 | $ 500.00 | $ (1,800.00) | accrual |
| 4/20/2018 | $ (300.00) | $ (2,100.00) | 416743 |
| 5/1/2018 | $ 500.00 | $ (1,600.00) | accrual |
| 5/1/2018 | $ 300.00 | $ (1,300.00) | accrual |
| 5/18/2018 | $ (300.00) | $ (1,600.00) | 432058 |
| 6/1/208 | $ 500.00 | $ (1,100.00) | accrual |
| 6/1/2018 | $ 300.00 | $ (800.00) | accrual |
| 6/7/2018 | $ (1,000.00) | $ (1,800.00) | verfied dfhs |
| 7/1/2018 | $ 500.00 | $ (1,300.00) | accrual |
| 7/1/2018 | $ 300.00 | $ (1,000.00) | accrual |
| 7/9/2018 | $ (300.00) | $ (1,300.00) | verfied dfhs |
| 7/27/2018 | $ (500.00) | $ (1,800.00) | verfied dfhs |
| 8/1/2018 | $ 500.00 | $ (1,300.00) | accrual |
| 8/1/2018 | $ 300.00 | $ (1,000.00) | accrual |
| 8/1/2018 | $ (300.00) | $ (1,300.00) | 412034 |
| 8/20/2018 | $ (500.00) | $ (1,800.00) | 422792 |
| | | | |
| | | | |

# Exhibit D

Litigation efforts between 5/26/2016 and 6/5/2017

**Disclaimer:**

*The following is an excerpt from a pleading directly challenging state court judgments; which the purported Rooker-Feldman doctrine at least encourages this court to abstain considering. It's reasonable to expect some overlap in arguments aimed at attacking state court judgments with those levied in a 42 U.S.C. § 1983 compliant seeking federal redress for constitutional violations in state court proceedings.    While I caution that this is not an official pleading as you'll find reference to paragraphs and exhibits which are not included with it  I've added the (**735 ILCS 5/1-109**) Certification to attest to the authenticity of the arguments and evidence within.*

## **Count I**

Conspiring to falsify and falsifying "Section 16 My assets: a) Cash and Cash Equivalents" of the
financial Affidavits

1. **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2** are "Mandatory pretrial

    procedures for post-judgment domestic relations proceedings. While it's clearly written on

    the financial affidavit itself that making statements within which one knows to be false is

    perjury as outlined in (**735 ILCS 5/1-109**) and falsifying other documents required to be

    incompliance with the rules can also satisfy many elements of intrinsic fraud; because the

    rules represent mandatory pretrial procedures put in place to allow the court to impartially

    adjudge domestic relation cases, efforts to defile these rules are a fraud upon the court. [1]

---

[1] "Fraud upon the court" has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." Kenner v. C.I.R., 387 F.3d 689 (1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23. The 7th Circuit further stated "a decision produced by fraud upon the court is not in essence a decision at all, and never becomes final."

This is especially true when an attorney/officer of the court, violates professional conduct standards by helping or knowingly allowing their client to perpetuate the said scheme. [2] [3] [4]

2. The first and most obvious instance in which Michelle Murray made statements aimed at circumvent **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2**, can be seen by comparing Section 16 My assets: a) Cash and Cash Equivalents presented within Financial Affidavit#1 dated 7/25/2016, with what **Michelle Murray and Attorney "Dworkin"** refers to as the updated Financial Affidavit#2 dated 9/19/2016 as depicted below.

**Financial Affidavit#1 dated 7/25/2016 Record Page (C 666)**



**Financial Affidavit#2 dated 9/19/2016 Record Page (C 641)**

---

[2] "Attorneys and counselors are not officers of the United States; they are officers of the court, admitted as such by its order upon evidence of their possessing sufficient legal learning and fair private character." *Ex parte Garland*, 72 U.S. (4 Wall.) 333 (1866

[3] [1] A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice. **ARTICLE VIII. ILLINOIS RULES OF PROFESSIONAL CONDUCT**

[4] **Rule 8.4** It is professional misconduct for a lawyer to: **(a)** violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another. **(b)** commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects. **(c)** engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. **(d)** engage in conduct that is prejudicial to the administration of justice.

16. **My assets:**

   a  Cash and Cash Equivalents

   Checking, Savings, Money Market, and Other Bank or Credit Union Accounts

   | | Name of Bank or Institution | Name on Account | Account Type | Balance |
   |---|---|---|---|---|
   | 1 | Fifth third | Michelle M | Check | $14,583 |
   | 2 | Fifth Third | Michelle M | check | $2,504 |
   | 3 | Fifth Third | Michelle M | Saving | $518 |
   | 4 | | | | $ |
   | 5 | | | | $ |

3. The two depictions when considered together is evidence of Michelle Murray while being represented by Attorney Dworkin, knowingly and intentionally failing to include the account showing a balance of $14,583 on Financial Affidavit#2 dated 9/19/2016, on Financial Affidavit#1 dated 7/25/2016. We'd later learn that Michelle Murray failed to include at least 5 other accounts at the same institution and several others at other institutions neither included on Financial Affidavit#1 nor Financial Affidavit#2. For this reason, as it relates to Michelle Murray, the updated Section 16 My assets: a) Cash and Cash Equivalents of Financial Affidavit#2 dated 9/19/2016, is but clear evidence of "Perjury" as outlined in **(735 ILCS 5/1-109);** which also satisfy many elements of intrinsic fraud.

4. Critical in understanding that both **Michelle Murray and Attorney "Dworkin"** schemed to tender Financial Affidavit#2 dated 9/19/2016 is the fact that after tendering Financial Affidavit#1 dated 7/25/2016, counsel requested and was granted leave to withdraw as can be seen below. **(See Record C 369)**

**ORDER**

3) This (matter is set for status on 9/21/16 at 9:30
   If all discovery has been exchanged, a Hearing
   date shall be set;
4) Michelle's counsel, Sheryl Dworkin, is given
   leave to withdraw. Michelle has 21 days to
   tell her own appearance or obtain substitute
   counsel.

5. The "record" is silent on the reason why after representing Michelle Murray between 9/2012 thru 7/2016, that counsel would request to be withdrawn at the beginning of a child support modification proceeding. However; it's clearly reflected in that "record" as shown below that while being officially withdrawn, Attorney Dworkin was providing and billing Michelle Murray for legal services and advice. As can be see below on 9/13/2016 **Michelle Murray and Attorney Dworkin** discussed subpoena Carleton B. Syph II records for things he neglected to put in his Financial Affidavit.[5] This conversation was held less than a week prior to when **Michelle Murray and Attorney Dworkin** tendered the false Financial Affidavit#2 dated 9/19/2016 and the other financial information by way of an interstate carrier; which failed to include things that should have been included in the said financial affidavit.

6. The invoice depicted below strongly suggest that Attorney Dworkin planned to be added back on as the counsel of record on or before the morning of 9/21/2016. Where in which she'd help **Michelle Murray** argue that the same theft which prevented her client from

---

[5] It' important to note, Carleton B. Syph II was never served with a list of interrogatories or discovery request. To date the opposing side has provided no evidence or arguments which suggest that he has or has intended to mislead Michelle Murray, any of her 5 attorneys nor the court about his financial position or the change in circumstances; which warrants a modification of his child support.

tendering 2015 Tax returns in July of 2016, was also to blame for why her client had not

filed 2013 nor 2014.

**(from** 4/12/2017 PETITION FOR ATTORNEY FEES**)**

| DATE | DESCRIPTION | CT COSTS | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| 9/13/2016 | Telephone with Michelle about ██████ ██████ Carleton's latest filing, sub poena'ing records for things he neglected to put into his financial disclosure affidavit, etc. | | 0.9 | 300.00 | 270.00 |
| 9/21/2016 | Court appearance for status - both parties ordered to complete the discovery as to exchanging tax returns; new appearance filed; phone with Michelle after court regarding garnishing Carleton's bank accounts | | 0.76667 | 300.00 | 230.00 |

**(9/21/2016 Appearance filed)**



**(9/21/2016 Order of Continuance)**



7. Equally critical in understanding that **Michelle Murray and Attorney "Dworkin"**

schemed to tender Financial Affidavit#2 dated 9/19/2016, is Attorney Dworkin's request

to be withdrawn a second time on 6/5/2017.

8. As explained the record was silent as to why after 4 years of representation, Attorney Dworkin would withdraw from representing Michelle Murray after she tender Financial Affidavit#1 dated 7/26/2016; a reasoning which to some extent becomes more obscured by counsel's decision to be added back onto the case. After being presented with the following post trial pleadings; which clearly proves the Michelle Murray falsified the <u>16 My assets: a) Cash and Cash Equivalents</u> section of both Financial Affidavits:

> 5/2/2017 Motion to Reconsider dated (**See Record Pages C 629 – C 669**)
>
> 5/12/2017 Petition for Direct Criminal Contempt of Court dated (**See Record Pages C 882 – C 888**).

It was reasonable to believe, counsel's decision to withdraw a second time on 6/5/2017, was in order to align with professional conduct standards **Rule 1.16** and **Rule 4.1**. [6] [7] [8]

9. Yet with indisputable evidence in hand proving Michelle Murray's falsified this section in both Financial Affidavits, Attorney Dworkin goes out of her way, not to distant herself from the fraudulent acts, but to defend them as can be seen in the depictions of a 7/24/2017

---

[6] **RULE 4.1** In the course of representing a client a lawyer shall not knowingly: **(a)** make a false statement of material fact or law to a third person; or **(b)** fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.

[7] **RULE 1.16 (b)** a lawyer may withdraw from representing a client if: **(2)** the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent; **(3)** the client has used the lawyer's services to perpetrate a crime or fraud;

[8]**Ill. R. Prof'l Conduct (2010) R.1.2 cmt. 11** (eff. Jan 1, 2016) When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer is required to avoid assisting the client, for example, by drafting or delivering documents that the lawyer knows are fraudulent or by suggesting how the wrongdoing might be concealed. A lawyer may not continue assisting a client in conduct that the lawyer originally supposed was legally proper but then discovers is criminal or fraudulent. The lawyer must, therefore, withdraw from the representation of the client in the matter. See Rule 1.16(a). In some cases, withdrawal alone might be insufficient. It may be necessary for the lawyer to give notice of the fact of withdrawal and to disaffirm any opinion, document, affirmation or the like. See Rule 4.1. In such situations, the lawyer should also consider whether disclosure of information relating to the representation is appropriate. See Rule 1.6(b).

pleading filed by Attorney Dworkin, before appearing in court on 7/28/2017 to argue the same.

**(Record Page C 1107 pleading paragraph C)**

> The Respondent has chosen to ignore both her sworn testimony as to the loss of her computer with her financial information contained therein, and the fact that she had depleted some of her savings between the various affidavits

10. As read in the depiction above, Attorney Dworkin attempts to explain there was a "depletion" in savings shown between both affidavits. However; the saving figures listed on both Financial Affidavits as depicted below are essentially the same.

Financial Affidavit#1 dated 7/25/2016 **(See Record C 666)**

16. **My assets**.

a  Cash and Cash Equivalents

Checking, Savings, Money Market, and Other Bank or Credit Union Accounts

| | Name of Bank or Institution | Name on Account | Account Type | Balance |
|---|---|---|---|---|
| 1 | | | | $ |
| 2 | | | | $ |
| 3 | | | | $ |
| 4 | | | | $ |
| 5 | | | | $ |

Financial Affidavit#2 dated 9/19/2016 **(See Record C 641)**

| 16. My assets: | | | |
|---|---|---|---|
| a  Cash and Cash Equivalents | | | |
| Checking, Savings, Money Market, and Other Bank or Credit Union Accounts | | | |
| Name of Bank or Institution | Name on Account | Account Type | Balance |
| 1  Fifth third | Michelle M | Check | $14,533 |
| 2  Fifth Third | Michelle M | check | $3,504 |
| 3  Fifth Third | Michelle M | Saving | $518 |
| 4 | | | $ |
| 5 | | | $ |

11. In fact, as explained in my initial **RESPONSE TO PETITION FOR AWARD OF ATTONREYS FEES AND COST** filed 5/9/2017 **(See Record  C 840 – C 871)**, which the depiction of Attorney Dworkin's words is directed at, I argued then as I do now, there was never an argument presented that suggested that I, or anybody, should have expected specific account balances to remain unchanged between 7/25/2016 and 9/19/2016 as suggested in the depiction in **paragraph 48**.  The argument has always been clearly focused on the fact that Section 16 My assets: a) Cash and Cash Equivalents shown on the Financial Affidavit#1 dated 7/25/2016 had "increased" by 694%, going from $2,648 on 7/26/2016 to $18,605 on 9/19/2016

**(See Record Pages C 844)**

(c)     If the banking information alone, which shows a **694%** growth in value in less than two months, was not reason enough for counsel to least consider the possibility of perjury.

12. This pattern of behavior, both the willingness to assist her client in engaging in criminal and fraudulent acts and going out of her way to defend the clear evidence of fraud and perjury rather than distancing herself from both, is reflective of the type of litigation tactic

which were also present during the dissolution of Marriage proceedings held between 2012

& 2014. To back this up, I first point to the paragraph depicted below:

REPLY TO RESPONDENT'S RESPONSE TO PETITION FOR AWARD
OF ATTORNEY'S FEES AND COSTS
**(See Record C1106 – C1107 pleading paragraph 1)**

That Sheryl B. Dworkin denies that her former client, MICHELLE

MURRAY, committed fraud, that MICHELLE tendered all information that

was requested by the Respondent (who never *properly requested infor-
mation*) during the course of the dissolution proceedings.

13. I then bring to the courts attention **RESPONDENT'S PRODUCTION REQUEST TO
PETITIONER and INTEGRRATORIES** served and filed on 5/28/2013 **(Record Page
C 122 – C 138** "Production Request & Interrogatories"**)**, as evidence contrary to counsel's
assertion that **Carleton B. Syph II** had never asked for the information before. In fact, as
can be seen in the record, he had indeed requested the information during the dissolution
proceedings. It's just as explained on numerous occasions before and again in this pleading,
**Michelle Murray and Attorney Dworkin**, simply conspired to not disclose the
information **Carleton B. Syph II** <u>asked of them</u> in 2013; just like how they conspired to
submit a false Financial Affidavit#1 and a false Financial Affidavit#2 aimed at not
disclosing the information **Judge Edward A. Arce** <u>ordered them to provide</u> on 6/7/2016.

14. The depicted paragraphs from counsel's pleading; which attempts to convince a judge that
the clear evidence of an increase in asset value was actually a depletion in assets, that
**Carleton B. Syph II** never properly requested the information to reveal the fraud, along
with the other arguments and evidence which makes it hard to distinguish if indeed there

is a distinction to be made, between counsels utter disregard for the professional standards put in place to protect attorneys form being implicated in their clients schemes, from her actual participation in the scheme itself, is indicative of the litigation tactics deployed by Attorney Dworkin in her representation of Michelle Murray between 9/26/2012 and 7/28/2017.

15. As can be seen in the depiction above and the concluding words below all of which were presented after being officially withdrawn on 6/5/2017; Attorney Dworkin had no intentions of trying to undo what had been done by the false statements made by Michelle Murray in Section 16 My assets: a) Cash and Cash Equivalents of Financial Affidavit#1 and again in the same section of Financial Affidavit#2. If anything, the evidence suggests that Attorney Dworkin, while being officially withdrawn a "second time" was willing to go out of her way to offer up her own false statements to justify the fraud.

**(Record Page C1106 – C1107 pleading paragraph 1.h)**

> DWORKIN has done nothing improper throughout the entire course of these proceedings

16. Those reasons support that **Michelle Murray and Attorney Dworkin** not only conspired to conceal material assets from Section 16 My assets: a) Cash and Cash Equivalents of Financial Affidavit#1 dated 7/26/2016 and Financial Affidavit#2 dated 9/19/2016 during the child support modification proceeding, but they also conspired to tender a false Financial Disclosure Statement dated 12/14/2012 **(See Record Pages C 53 – C 61 "Financial Disclosure")** to conceal marital assets during the Dissolution of Marriage proceedings held on 9/12/2012 7/22/2014. This is the result of license professionals with reckless abandonment, mowing over the professional conduct standers which serve as the

controls to prevent such a case from reaching this height. Then conspiring to try and cover it up.

## Count II

Conspiring to falsify and falsifying <u>Section 11) My Gross Monthly Income: Child Support for children not of this relationship</u> of the Financial Affidavits

17. The second instance in which Michelle Murray made statements she knew to be false and Attorney Dworkin knew or should have known to be false, to further the scheme to circumvent **Cook Co. Cir. Ct. R. 13.3.1** and **Cook Co. Cir. Ct. R. 13.3.2**, can be seen by looking at <u>Section 11 My Gross Monthly Income: Child Support for children not of this relationship</u> presented within Financial Affidavit#1 dated 7/25/2016 and then looking at the same section on what Michelle Murray and Attorney Dworkin refers to as an updated Financial Affidavit#2 dated 9/19/2016 as depicted below.

**Financial Affidavit#1 dated 7/25/2016 See Record Page C 662**

Child support for children of this relationship   (respondent has not )   $500.00
Child support for children not of this relationship                  paid   $

**Financial Affidavit#2 dated 9/19/2016 See Record Page C 637**

Child support for children of this relationship   (respondent has not )   $
Child support for children not of this relationship                  paid   $500
                                                                          $

18. The statement made on Financial Affidavit#1 and again on Financial Affidavit#2, corresponds with statements made by Michelle Murray on the witnessed stand during the 3/22/2017 hearing.

19. When crossed examined about both Financial Affidavits; Michelle Murray explained that she had not received any payments for child support for her other child in over 3 or 4 years. However; there is a preponderance of evidence supporting that Michelle Murray does indeed and had been receiving child support for children not of this relationship. This includes a series of checks she received from Child Support Services.

20. In fact, it appears as if Michelle Murray had been receiving a weekly distribution of at least $92.33 from Child Support Services for **some time** before tendering Financial Affidavit#1 dated 7/25/2016 and Financial Affidavit#2 dated 9/19/2016; both of which show no Child Support for children not of this relationship.

21. One check dated for 9/19/2016, was signed and deposited by Michelle Murray on 9/23/2016; just 3 days after tendering Financial Affidavit#2 dated 9/19/2016. Then another check was signed and deposited by Michelle Murray on the same day she signed Financial Affidavit#2 dated 9/19/2016.

PETION FOR RULE TO SHOW CAUSE—NOT INCLUDING IN FNANCIAL AFFIDAVITS#1 OR FINANCIAL AFFIDVIT#2 AN AMOUNT FOR "Child Support for children not of this relationship"
**(Record Page C 881 and C879)**





Posting Date 2016 Sep 23 Posting Check Number 27075389 Amount $92.31     Posting Date 2016 Sep 23 Posting Check Number 27075389 Amount $92.31

22. The evidence of Michelle Murray signing and depositing checks from Child Support Services in general, and especially the one deposited on the day she signed Financial Affidavit#2, eliminates any "reasonable doubt" as to whether Michelle Murray's decision to include nothing for <u>Child Support for children not of this relationship</u> qualifies as the form of perjury outlined **(735 ILCS 5/1-109).**

23. Not only does the evidence suggest that it was "*highly probable*" that Michelle Murray knew this statement was false; Attorney Dworkin also knew or should have known the statement made on Financial Affidavit#1 and again on Financial Affidavit#2 were false.

24. To back up this claim, I refer to the entire case file for case **12D80849** in general, as evidence of several years of litigation by Attorney Dworkin on behalf of Michelle Murray; to get the Child Support order in questioned entered.

25. However; I specifically point to a line item on one of the invoices filed as evidence supporting arguments in a pleading I filed in case **12D009167** as seen below.

RESPONDING TO PETITIONER'S MOTION TO MODIFY AN ORDER OF PROTECTION 5/12/2017

**(See Record Page C 902)**

| /2013 | Drafted the Petition for Contempt and sent to Michelle after speaking to her, to IDES (which would not confirm unemployment benefits), Sandy Smith (colleague who will call Michael and scam him) | 1.43333 | 275.00 | 394.17 | |

I then point to the following arguments presented by Attorney Dworkin

REPLY TO RESPONDENT'S RESPONSE TO PETITION FOR AWARD
OF ATTORNEY'S FEES AND COSTS 7/24/2017
**(See Record Page C 1109 pleading paragraph 1.e)**

> the Respondent claims that DWORKIN is a
> "debt collector" and therefore knew or should have known that
> there were errors (according to him) in MICHELLE's tendered
> discovery. He based that contention on a complaint filed in 2013
> against DWORKIN in the civil division of the Circuit Court (which
> complaint was based solely on counsel's error in filing the collection
> case in the wrong county).

**(Record Page C1110 pleading paragraph 1.f)**

> Respondent accuses counsel of having a pro-
> pensity to "scam and defraud federal agencies and its citizens" by
> noting that the word "scam" was used in an invoice on a "collater-
> ally related case". First, the case from which the Respondent
> obtained that invoice is not collaterally related to this case. It is a
> separate child support action for MICHELLE's older child with a
> different father. It has no relation to this case.

26. I ask the court to consider the proceeding 2 depictions presented and evidence and
argument in Count I **paragraphs 93 & 94** along with the rest of the arguments and
depictions in this count to support that hat **Michelle Murray and Attorney Dworkin**
actions do not merely represent a culpable ignorance to the truth, but instead reflects a

deliberate attempt by a litigant to committing perjury and attorney helping her client to commit perjury.

27. Surely a reasonable justice would consider that maybe this is reflective of an attorney not performing the due diligence required of the profession; as even **Carleton B. Syph II** considered the possibility before being sternly corrected by Attorney Dworkin who while being officially withdrawn came back to explain on 7/24/2017 as depicted below.

**(Record Page C1109 pleading paragraph f)**

> f.    DWORKIN denies the allegations in Paragraphs #2(b-d) as to the
>
> claims that counsel did not properly review her client's information,

28. That means that Attorney Dworkin saw both of the written notations on Financial Affidavit#1 and Financial Affidavit#2 as depicted below

**Financial Affidavit#1 dated 7/25/2016 See Record Page C 662**



**Financial Affidavit#2 dated 9/19/2016 See Record Page C 637**

29. And although counsel spent the better part of 2 years in protracted litigation to get the child support ordered entered, she accepted that Michelle Murray was not as much interested in pursuing collection efforts for child support she wasn't even receiving, as she was in a

pugilistic approach to defeating **Carleton B. Syph II's** Petitions to Modify Child support which are based on both, verifiable evidence and sound reasoning aligned with statue.

30. It's important to note here that the statement depicted in in **paragraph 66** was submitted by Attorney Dworkin, after being provided with indisputable evidence proving that Michelle Murray deposited a check for Child Support for her other child on the exact same day she signed Financial Affidavit#2 attesting to the fact that she wasn't receiving any support for her other child. This is evidence of counsel going out of her way to defend indisputable evidence of false statements, in order for a litigant she no longer represents to be awarded attorney fees, further supports, that **Michelle Murray and Attorney Dworkin** conspired to tender a false Financial Affidavit#1 dated 7/25/2016 and a false Financial Affidavit#2 dated 9/19/2016.

### Count III

Conspiring to falsify and falsifying <u>Section 16 My assets: e) Business Interest</u> of the Financial Affidavits and filing and tendering false 2013, 2014 & 2015 Tax Returns

31. Count III is less obvious, but more insightful in proving that **Michelle Murray, Attorney Dworkin and <u>an unnamed tax account</u>** not only conspired to submit 2 false Financial Affidavits and then filed and tendered 3 false Tax Returns to authenticate the false financial affidavits, but violated both **(225 ILCS 425/2.04)** Collection Agency Act and **(15 U.S. Code § 1692)** Fair Debt Collection Practices Act when attempting to intimidate **Carleton B. Syph II** in to discontinuing the discovery; which would ultimately prove it.

32. To best understand this portion of the scheme, the court must take into consideration the following seven pieces of evidence.

33. The <u>first two pieces</u> of evidence are sections from the Financial Affidavit's themselves. When looking at <u>Section 16 My assets: e) Business Interest</u> on Financial Affidavit#1 dated 7/25/2016 depicted below, you'll see prior to filing 2013, 2014 and 2015 Federal Tax Returns, Michelle classified Eco-Living Inc as a S-Corporation with a fair market value of $60,000. Then when looking at <u>Section 16 My assets: e) Business Interest</u> of Financial Affidavit#2 dated 9/19/2016 also depicted below, you'll see she includes nothing in that section.

**Financial Affidavit#1 dated 7/25/2016 (See Record Page C 667)**

| e | Business interests | | | |
|---|---|---|---|---|
| | Name of Business | Type | % of Ownership | FMV |
| 1 | | | | $ |
| 2 | | | | $ |
| 3 | | | | $ |

**Financial Affidavit#2 dated 9/19/2016(See Record Page C 642)**

| e | Business interests | | | |
|---|---|---|---|---|
| | Name of Business | Type | % of Ownership | FMV |
| 1 | | | | $ |
| 2 | | | | $ |
| 3 | | | | $ |

34. The <u>third piece of evidence</u> as depicted below, are the concluding words from an email sent by Michelle Murray explaining that she was working with a "Tax Accountant" to prepare her 2013 Federal Tax Return for Eco-Living Inc.

**(See Record C 446** "Michelle's Email")

> As stated in the July 26, 2016 court order, my laptop was stolen early 2015 thus I do not have 2015 tax return prepared. I filed an extension with the IRS and 2015 is not due for filing until October 17, 2016. I did not file a 2014 nor 2015 Tax Return. I am working with my tax accountant now to begin filing for tax year 2013.
>
> Michelle Murray

35. The <u>fourth piece of evidence</u> is an excerpt from one **Michelle Murray and Attorney Dworkin's** pleadings to support that an **unnamed accountant** was working on Michelle Murray's 2013, 2014 and 2015 tax returns.

PETITIONER'S RESPONSE TO RESPONDENT PETITION FOR RULE **(Record Page C 481)**

> Furthermore, that the Petitioner represented that her 2014 and 2015
>
> returns were with an accountant, but tendered her 2013 returns in court.
>
> Later, when the Court determined that the parties need only exchange
>
> 2014 and 2015, the Respondent refused to return the 2013 returns to the
>
> Petitioner.

36. The <u>fifth piece of evidence</u> is an excerpt from a Guardian Ad Litem Report filed for an estate Michelle Murray is the administrator of. In it Michael J. Ori (Atty #6282032) wrote in the report, which was filed in Lake Cook Co. and furnished to Judge Diane Winter, about his interview of one Michael Murray (the brother of Michelle Murray). Michael J. Ori wrote in that report that, Michael Murray believed that his sister (Michelle Murray) should handle the financial matter of the estate, because she is "educated in accounting". An excerpt of the report is provided below. **(See Exhibit** Guardian Ad Litem Report Excerpt Depicted below.)

> Also, Michael believed that financial matters of his father should be handled by his sister since she is educated in accounting.

That statement corroborates statements **Michelle Murray** made to **Carleton B. Syph II** before and during the marriage, wherein which she explained, that she not only has an undergraduate degree in Accounting and a Master's in Business Administration from the University of Illinois at Champaign, but she is also a Certified Public Accountant.

37. The sixth piece of evidence is a collection of Corporate Annual Reports to be considered as proof that **Michelle Murray**, paid the necessary filing fee for Eco-Living Inc to operate as and be considered a corporation in good standing with the state of Illinois.

PETITION TO SHOW RULE FOR CAUSE-FOR SUBMITTING "2015 TAX RETURNS" SHOWING GROSS INCOME SUBSTANIALLY LESS THAN FIFTH THIRD DEPOSITS
**(Record Pages C 989 – C994)**

38. The seventh piece of evidence is a Schedule C for Sole Proprietor used to report the operations of Eco-Living Inc a Corporation registered with the state of Illinois, that was filed along with **Michelle Murray's** 2013, 2014 & 2015 Federal Tax Returns.

PETITION TO SHOW RULE FOR CAUSE-FOR SUBMITTING "2015 TAX RETURNS" SHOWING GROSS INCOME SUBSTANIALLY LESS THAN FIFTH THIRD DEPOSITS
**(Record Pages C 973)**

39. With those seven pieces of evidence in hand, the court should be able to understand that Michelle Murray who according to her possess an MBA and is a CPA, correctly listed Eco-living as a S-corporation on Financial Affidavit#1 dated 7/25/2016.

40. Then upon realizing that she'd need to file and furnish to the court form 1120 or 1120S to report the business financials of the corporation; **Michelle Murray and a hired Tax**

**Accountant** conspired to file and tendered the false 2013, 2014 and 2015 Tax Returns around the 4th quarter of 2016, by reporting the results of the corporation on a Schedule - C for sole-proprietorships.

41. While I believe the decision to not file 2013, 2014 and 2015 Tax Returns until around the 4th quarter of 2016 is part of a separate scheme, the decision to use the wrong forms was largely aimed at concealing the cash and cash equivalents they chose not to include in Section 16 My assets: a) Cash and Cash Equivalents of the two False Financial Affidavits. An allegation first alluded to in **Count I** when explaining that both financial affidavits failed to include 5 accounts at Fifth Third and several accounts at other intuitions listed nowhere on either financial affidavit.

42. To back up this claim, I point not only to the 9/19/2016 email and the 2013 Tax Return tendered in open court on 9/20/2016, but to the following statements made by Attorney Dworkin in her response to my Petition for Rule penned sometime between 10/17/2016 and 11/21/2016.

PETITIONER'S RESPONSE TO RESPONDENT PETITION FOR RULE
**(Record Page C 481)**

> **Furthermore, that the Petitioner represented that her 2014 and 2015 returns were with an accountant, but tendered her 2013 returns in court. Later, when the Court determined that the parties need only exchange 2014 and 2015, the Respondent refused to return the 2013 returns to the Petitioner.**

43. The depiction above should serve as evidence supporting two things. First, the unnamed tax accountant was also working on Michelle Murray's 2014 & 2015 tax returns; which is

significant because Michelle Murray would eventually tender self-prepared 2014 & 2015 Tax returns as well. Second, the court should take heed to the fact, that after tendering the self-prepared 2013 Tax Return, which Michelle Murray indicated in her email that a tax accountant was working on, **Michelle Murray and Attorney Dworkin** asked **Judge Edward A. Arce** to order that **Carleton B. Syph II** return it back to them; which he denied.

44. Its argued that one needs only to consider **Michelle Murray and Attorney Dworkin's** knowledge of the consequences for tendering 2 false Financial Affidavits, to understand their motive for relying on dubious "debt collector" techniques to discourage **Carleton B. Syph II** from conducting the discovery; which would prove it.

45. Acting on that motive; which is argued was multiplied by the fact that Michelle Murray had already tendered a false 2013 Tax Return and had not filed her 2014 & 2015 taxes by the 10/17/2016 IRS, as affirmed by counsel's pleading

**(See Record C 482)**

> 6. That the Petitioner did, in fact, advise the Court that she had an extension for 2014 and 2015 with an expiration date of October 17, 2016. That was not a date by which she was to have the returns to the Respondent, only the date by which the returns were supposed to be sent to the IRS. She has not been able to forward those returns yet, and will be penalized by the IRS for the late payments.

on 10/25/2016 relying on the truthful disclosure within **Carleton B. Syph II's** Financial Affidavit dated 8/23/2016, **Michelle Murray and Attorney Dworkin** filed Citations to Discover Assets; putting an immediate freeze on all of his bank accounts.

**46.** Not only were the Citations false and misleading; which is a direct violation of **(15 U.S. Code § 1692)** Fair Debt Collection Practices Act, **if** this method of collection was justifiable, its argued the way in which the turnover of funds was handled also violated **(225 ILCS 425/2.04)** Collection Agency Act. The arguments and evidence to back up those claims are best articulated in 735 ILCS 5/2-1001(a)(4) PETITION FOR SUBSTITUTION OF JUDGE EDWARD A. ARCE see exhibit (##/##/2018)

47. Those violations are cited in this in this portion of the pleading, as evidence that **Michelle Murray and Attorney Dworkin** acted on counsel's propensity to scam and engage in illegal "debt collector" techniques as exhibited in cases like Cook Co. Case 12D80849, the two **15 U. S. C. §1692** (Fair Debt Collection Practices Act) complaints 1:13 CV 08565 & 97 C 4334 filed in the Northern District of Illinois and the other 15+ cases where it appears as if counsel had as she explained, "errored in filing collection cases in the wrong Cook Co." (**See Exhibit C** "Northern District Complaints") when they decided to try and intimidate **Carleton B. Syph II** into discontinuing discovery, by putting a freeze on all of his bank accounts. The discovery which I add, would later prove as presented in this pleading, that **Michelle Murray, Attorney Dworkin** and an **unnamed tax accountant** conspired to tender 2 false Financial Affidavits and 3 false Tax Returns as part of a scheme which in part was aimed at circumventing **Cook Co. Cir. Ct. R. 13.3.1(b)** and **Cook Co. Cir. Ct. R. 13.3.2(a)**. This concludes the **3rd reason** for why I say, Michelle Murray, Attorney Dworkin & an unnamed tax accountant, conspired to tender a false Financial affidavit#1 dated 7/25/2016, a Financial Affidavit#2 dated 9/19/2016 and then filed and tendered three false Tax Returns, to commit common law fraud, fraudulent concealment and a fraud upon the court.

Name Under the penalties as provided by law pursuant to Section 5/1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she/he verily believes the same to be true.


Print: __Carleton B. Syph II__ Signature:_____Date: __6/05/2018____

# Exhibit W

"It was kind of a stepchild of the system," longtime domestic relations Judge Thomas Carr

# After legal challenges, Cook County's court for unwed parents quietly goes away



Vito Glazers, 32, says he disliked Cook County's parentage court facilities and the way it made him feel — "like a file number." (Alyssa Pointer / Chicago Tribune)

By **Steve Schmadeke**
Chicago Tribune

SEPTEMBER 18, 2017, 5:15 AM

**W**hen Vito Glazers and the mother of his child couldn't work out a visitation schedule for their then-infant son, he did what many parents do and went to court and asked a judge to intervene.

But when he arrived at the Daley Center court complex in downtown Chicago for the first time last year, Glazers learned that because he and the boy's mother were never married, his case would be heard in the basement, where former storage space had been converted into cramped courtrooms. Divorcing couples or those already divorced facing similar child-custody issues were assigned to better-appointed courtrooms upstairs.

"I've never been to prison, but that's a little like what it felt like," said Glazers, 32, of Mount Prospect. "It was ...................... ................ ...... ...... ........ .......... .........psychologically break people."

Support Quality Journalism
Subscribe for only 99¢      START NOW ›

For years, the last large relic of Illinois' two-tiered system for child support and paternity cases — one court for married couples and a separate one for unmarried parents — lived on in Cook County.

A holdover from the days when state law referred to the children of unwed parents as "bastards," Cook County's Parentage and Child Support Court for years was held in police station courtrooms and other buildings separate from divorce court in downtown Chicago. The court, originally intended as a way to quickly get unwed mothers child support, was moved to the basement of the Loop's Daley Center court complex as part of an informal settlement in a 1993 federal discrimination lawsuit alleging single parents were treated differently than divorcing parents in child custody and support cases.

Even after the move, divorce cases were heard in larger, better-appointed courtrooms upstairs.

But in February, parentage court, as it has long been informally known, was abolished in response to a new round of possible legal action over its constitutionality and an acknowledgment of larger social changes that mean not quite half of the county's child support and custody cases are now brought by unmarried parents. That's up from about 5 percent several decades ago.

"It was kind of a stepchild of the system," longtime domestic relations Judge Thomas Carr said of parentage court. The Domestic Relations Division of Cook County circuit court handles the county's divorce and child custody cases.

## "

# I've never been to prison, but that's a little like what it felt like.

— Vito Glazers on Cook County's parentage court facilities

**Court in converted closets**

Experts said Cook County was the only large court jurisdiction in the country, and possibly the only one period, that sent divorcing parents with custody issues through one set of courtrooms and single parents through another. It was a product of Illinois law that for more than a century treated unmarried parents differently.

"There really was a disparate impact (on unmarried parents)," said Christine Hunt, a family law attorney and adjunct professor at John Marshall Law School, where she's a supervising attorney at the family and domestic violence legal clinic. "In some cases these courtrooms were converted closets."

Judge Grace Dickler, who heads the domestic relations division and led the effort to do away with parentage court said, "We wanted to make sure there was no perception of a stigma to children of unmarried parents."

Support Quality Journalism
Subscribe for only 99¢    START NOW ›    ...re of unmarried parents, so why would we have

Yet before parentage court was closed, only 7 of the 37 domestic relations judges at the Daley Center heard those unwed-parent cases, Dickler said.

Glazers' attorney Jeffrey Leving said the change was welcome and benefits more than just the parents.

"I believe that Chicago is extremely conservative and the court system historically views unwed parents as lesser," he said. "When you have unwed parents being treated like cattle in the basement of the courthouse where the future of their children is being balanced, that hurts their children."

Fewer couples are tying the knot in the first place, which meant a heavier caseload for parentage court, judges and family law attorneys say.

"People are co-habitating in large numbers," said longtime family law attorney Gemma Allen, who said the family-court consolidation has created a feeling "of greater acceptance or respect" for unmarried parents. "It never surprises me what I hear (about parenting arrangements) when I pick up the phone anymore. These are very responsible, very intentional, very concerned co-parents that want what's best for their children.

"I think the court system has changed with the times."

## Unconstitutional, and the Bastardy Act

The Chicago Appleseed Fund for Justice, a nonprofit public-interest group that works on judicial reforms, pushed hard for the change, presenting Dickler a detailed legal analysis in 2014 that found the system constitutionally flawed.

Already, a federal judge in 1993 had found that the county's bifurcated family courts system operated as an unconstitutional "classification system" that treated married — or divorcing — and unmarried parents differently.

Not everyone agrees that there were disparities between divorce and parentage court.

Laura Vallejo, the supervising attorney for Chicago Legal Clinic's parentage and child support desk, said from her windowless office in the Daley Center basement that from her perspective clients were treated the same in both types of courtrooms. The nonprofit clinic provides legal advice and representation to people who can't afford to hire a lawyer.

While the physical setting and busy calls may not have been ideal, she said it was attorneys who were most unhappy because cases assigned to parentage court could take up much of their day.

Like Cook County, child custody and support cases filed by unmarried parents are growing in the collar counties. In Kane and Lake counties, these cases are blended with the regular domestic relations call.

Support Quality Journalism
Subscribe for only 99¢                START NOW ›

...troom for unmarried parents working out child there has a judge specializing in these types of

cases, said DuPage County Domestic Relations Presiding Judge John Demling. Those wishing to avoid court altogether can opt for the newly established mediation program designed for unmarried parents.

In Cook County, judges and others said there have been hiccups in the new system, in which all judges hear a mix of cases, including some in the Daley Center basement. Some judges have been receiving a much higher proportion of redistributed cases than others, judges and attorneys say.

Helping move cases along are hearing officers that this year — under new funding from the Cook County Board after the state decided to stop paying for the program — expanded their roles to help parents resolve cases more quickly, taking much of the work on about 5,000 cases from judges, according to the Appleseed Fund.

The county's two-tiered court system grew out of the Bastardy Act of 1845 and its subsequent revisions that — shockingly to the modern ear — labeled the children of unwed mothers "bastards" and in early versions of the law essentially forced moms to relinquish custody of their offspring if the father paid child support.

Before parentage cases were heard in the Daley Center's basement, they were heard in a crowded set of courtrooms across the street. Some were also heard in a South Loop court building when the neighborhood was considered rough, said Allen, the family law attorney, and sometimes a deputy or even judge would walk her to her car when a case ended after dark.

And before that, cases were heard in district police station courtrooms. Longtime family law attorney Paul Feinstein recalled early in his career doing parentage cases in a wood-paneled courtroom at the old, now-demolished Chicago police headquarters at 11th and State streets.

"It's a lot better (now)," he said.

Glazers spent nearly a year in court before reaching a settlement in January, a month before the court consolidation. He said it allows him to have his son one day a week and every other weekend. It's not ideal, Glazers said, but at least he can see his son more.

He won't soon forget his time in the Daley Center basement.

"They pay no attention to you down there — you feel like a file number," Glazers said. "You feel completely unheard and completely helpless."

*sschmadeke@chicagotribune.com*

*Twitter @SteveSchmadeke*

Copyright © 2018, Chicago Tribune

Support Quality Journalism
Subscribe for only 99¢     START NOW ›

# Exhibit X

In *Gomez v. Comerford*, No. 93-C-3268 (N.D. Ill ), in the mid-1990s, Cook County was sued on behalf of the families in the Parentage Court



(https://www.chicagoappleseed.org)

Improving Lives by Improving Courts

# Reforming the Cook County Parentage Court

████████████████████████████████████████████
████████████████████████████████

Chicago Appleseed Fund for Justice had the privilege of providing research and analysis to a task force examining conditions for litigants and attorneys in the Parentage section of Domestic Relations Division

████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████

████████████████████████████
████████████████████████████



████████████Cook County takes an unusual approach to child support and parenting issue litigation by assigning cases based upon whether the child's parents have ever been married to each other. Cases concerning non-marital children are heard in the Parentage Court; cases with marital children are heard in Domestic Relations Court, called "Divorce Court". Our research did not uncover another jurisdiction which divides its child support and custody cases into separate

divisions based upon whether or not the child was born to married parents, although New Jersey courts have a judicial unit for "non-dissolution paternity and/or support" between persons who are not married or married parties who have separated but not filed for divorce.

In *Gomez v. Comerford*, No. 93-C-3268 (N.D. Ill ), in the mid-1990s, Cook County was sued on behalf of the families in the Parentage Court, alleging that the disparities between the Parentage Court and Divorce Court amounted to a violation of the families' rights under the Equal Protection Clause. The court concluded (http://www.leagle.com/decision/19931535833FSupp702_11447) that—given the history of discrimination against nonmarital children in Illinois—there was a triable issue of fact over whether the separate systems were originally put into place because of a discriminatory purpose. However, the suit was voluntarily dismissed when the County made some immediate changes to the Parentage Court. Among other things, the Parentage Court was moved, first from the various police stations around Chicago to a consolidated location on West Randolph and, recently, into the concourse level of the Daley Center.

The Domestic Relations Division's "Divorce Courtrooms" occupy conventional courtrooms dispersed over several upper floors in the Daley Center. The Parentage Court occupies a series of small courtrooms and hearing rooms in the concourse level and recently expanded to include two additional conventional courtrooms on that level.

The Domestic Relations Task Force, recognizing that these changes were important but that complaints about the Parentage Court persisted, asked Chicago Appleseed to evaluate possible outcomes of a renewed equal protection challenge to the divided Domestic Relations Courts. Our research team conducted dozens of interviews with attorneys and court staff with experience in both the Cook County Parentage and Domestic Relations courts and conducted additional interviews with practitioners in other jurisdictions, academics and family services professionals. An additional three dozen practitioners responded to an electronic survey about conditions in the Domestic Relations Division generally. We also conducted four days of court-watching and additional research into court management and litigant services in other jurisdictions.

Our report argues that the Cook County Parentage Court is on the brink in terms of its Constitutional legitimacy. Those working within the Parentage Court system praise improvements that have been made within the past year but a substantial number are still critical of the facilities, and the perceived inequities in caseloads and resources. Yet, our respondents in Cook County and in jurisdictions outside Illinois offer recommendations to the Circuit Court that, if implemented, would move the Court away from this brink—toward the point where the government interest argument could prevail in a constitutional challenge. The current Court administration has demonstrated its desire to improve the Parentage Court. We urge the Court to consider and implement additional improvements.

Foremost in our recommendations for improvements is the adoption of a service-based model in the Domestic Relations courts to better serve the needs of families in the system and to improve efficiency in a division that sees a large percentage of *pro se* litigants. Regardless of the separation of types of families in the Domestic Relations Division, there is an ever-growing need for assistance and coordinated services in our family courts.

Policy innovations in family courts commonly reflect the desire of court administrators to preserve the rights of parents, while maintaining judicial efficiency. Most family court innovation, as well, is responding to an increase in pro se litigants, increasingly complicated family structures, and the recognition that litigants often have social services needs that are driving their legal conflicts—problems facing the Parentage Court in Cook County.

The community courts model at work in a variety of courts in various jurisdictions is designed to assist courts and litigants in keeping cases organized and moving smoothly but is more holistic and expansive than simple management of existing child support cases. It focuses on coordinating services for families, including collecting information about other court cases (domestic violence or juvenile cases, for instance) that the parties are involved with. The community courts model assists dispute resolution through deployment of community resources and services, like job services, family counseling, child care alternatives, legal aid and other social services in order to free court resources to focus on uniquely judicial issues. Services are provided both to the court, in the form of case management, and to the litigants, in the form of social services.

Alternately, a case facilitation model, at work notably in California, is a comprehensive model designed to assist the court primarily by assisting litigants. Case facilitators are attorneys employed by the courts and their offices provide both basic case management services and comprehensive legal assistance services with settlement assistance. Case management services in a facilitation model include direct assistance to the court through in-court help calendaring, explaining procedural rules to litigants and calculating support payment as well as making minor adjustments to custody and visitation schedules and drafting orders. Services to litigants include education about rights and responsibilities, as well as legal aid workshops and self-help services. In addition to assisting pro se litigant with drafting documents, facilitator attorneys may facilitate settlements and agreed orders.

We commend the Cook County Domestic Relations Division, and Presiding Judge Grace Dickler, on her attention to the improvement of the court and hope significant change can be made.

Tweet (http://twitter.com/share?url=https://www.chicagoappleseed.org/reforming-the-cook-county-parentage-court/&text=Reforming the Cook County Parentage Court&via=chiappleseed)     Facebook (http://www.facebook.com/sharer.php?u=https://www.chicagoappleseed.org/reforming-the-cook-county-parentage-court/&t=Reforming the Cook County Parentage Court)     LinkedIn (http://www.linkedin.com/shareArticle?mini=true&url=https://www.chicagoappleseed.org/reforming-the-cook-county-parentage-court/&title=Reforming the Cook County Parentage Court&source=)     Tumblr (http://www.tumblr.com/share/link?

# Exhibit Y

"*Gomez v. Comerford*, No. 93-C-3268 (N.D. Ill )"

casetext     Search n.. ..ons of legal authorities...    Q    Sign In

Read   Analyses   How Cited 2

**GOMEZ BY HERNANDEZ v. COMERF...**
833 F. Supp. 702 (N.D. Ill. 1993)   Copy

 

# GOMEZ BY HERNANDEZ
# v.
# COMERFORD

Check If This Is Still Good Law

United States District Court, N.D. Illinois, E.D   Sep 22, 1993   Full title

833 F. Supp. 702 (N.D. Ill. 1993)   Copy Citation

**Holding discriminatory intent not required in challenge to overt discrimination**
Summary of this case from PUTNAM v. UNIVERSITY OF NEW HAMPSHIRE

## *MEMORANDUM OPINION AND ORDER*

CONLON, District Judge.

Jacqueline Ann Gomez, by her next friend, Virginia Hernandez; Melissa Erin Simmons, by her next friend, Dori Sauceda; and Chrystina Smith and Zachary Smith, by their next friend, Sharon Smith, individually and behalf of all others similarly situated (collectively "plaintiffs"), sue Harry G. Comerford, Chief Judge of the Circuit Court of Cook County, Illinois, in his official capacity under 42 U.S.C. § 1983. Plaintiffs allege that Judge Comerford has violated their rights under the equal protection clause of the Fourteenth Amendment of the United States Constitution by adopting and enforcing two separate and unequal systems for adjudicating child support, custody and visitation disputes in the Circuit Court of Cook County. Plaintiffs seek declaratory and injunctive relief. Judge Comerford moves to dismiss plaintiffs' amended complaint under Fed.R.Civ.P. 12(b)(6), while plaintiffs move for class certification under Fed.R.Civ.P. 23.

## *BACKGROUND*

Judge Comerford is responsible for the organization of the Cook County Circuit Court into two departments: the county department and the municipal department. Amended Complaint ¶ 12. One of the divisions of the county department, the domestic relations division,

**How cited**
Cases that have cited this case

### PUTNAM v. UNIVERSITY OF NEW HAMPSHIRE
637 A.2d 156 (N.H. 1994)

...His federal constitutional claim fails as well because his complaint does not allege intentional or purposeful discrimination, "an essential element of an equal protection claim." Dickens v. State of Mo., by Ashcroft, 887 F.2d 895, 896 (8th Cir. 1989), where the statute or policy is facially neutral. But see Gomez by Hernandez v. Comerford, 833 F. Supp. 702, 706 (N.D. Ill. 1993) (holding discriminatory intent not required in challenge to overt discrimination). He does not allege that the university engaged in discriminatory conduct "in part ` because of,' not merely ` in spite of,' its adverse effects upon an identifiable group."...

### ROMAN v. FIRST FRANKLIN FINANCIAL CORPORATION
No. 00 C 7228 (N.D. Ill. Apr. 2, 2001)

...The exact number of class members need not be pleaded or proved. See Gomez v. Comerford, 833 F. Supp. 702, 706 (N.D.Ill. 1993). However, the impracticability

**SEE 2 RELATED CASES >**

("children of married parents"). *Id.* at ¶¶ 13-14. In contrast, cases concerning paternity, support, custody and visitation of children whose parents have never been married to each other ("children of unmarried parents") cannot be brought in the domestic relations division. Instead, under the Parentage Act of 1984, as amended, Ill.Rev.Stat. ch. 40, ¶ 2501 et seq., cases involving children of unmarried parents must be heard in the municipal department rather than the county department. *Id.* at ¶ 15. Plaintiffs allege that Judge Comerford enforces this dual system under the General Orders of the Cook County Circuit Court and the circuit court rules. *Id.* at 1.

Plaintiffs allege that Judge Comerford maintains an overtly discriminatory system that treats children of unmarried parents in a different and unequal manner. The domestic relations division cases and any enforcement or modification actions affecting children of married parents are heard in the Daley Center. *Id.* at ¶¶ 14, 17. In contrast, cases brought in Cook County under the Parentage Act are heard in Parentage Court courtrooms located in or adjacent to Chicago police stations; post-judgment motions for enforcement or modification are heard either in the original Parentage Court courtroom or at 32 West Randolph in Chicago. *Id.* at ¶¶ 16, 18. Plaintiffs explain that the children of married parents enjoy numerous advantages over the children of unmarried parents because of the difference in facilities. *See id.* at ¶ 19. Plaintiffs allege that this overt discrimination fosters and reinforces the stigma of illegitimacy and violates the equal protection clause of the Fourteenth Amendment.

## DISCUSSION

### 1. The Motion To Dismiss

A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Triad Assocs., Inc. v. Chicago Housing Authority,* 892 F.2d 583, 586 (7th Cir. 1989), *cert. denied,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). When considering a motion to dismiss, this court must accept all well-pleaded facts as true, draw all inferences in favor of the plaintiffs, and view plaintiffs' allegations in the light most favorable to them. *Bontkowski v. First Nat'l Bank of Cicero,* 998 F.2d 459, 461 (7th Cir. 1993). This court will grant a motion to dismiss only if it appears beyond doubt that plaintiffs can prove no set of facts entitling them to relief. *Venture Assocs. Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 432 (7th Cir. 1993); *see also Hishon v. King Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232-33, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957). The amended complaint may be dismissed only if plaintiffs plead themselves out of court by alleging facts that show they are not entitled to judgment.

705    *Early v.* *705 *Bankers Life Casualty Co.,* 959 F.2d 75, 79 (7th Cir. 1992).

The motion to dismiss is based on equal protection jurisprudence. Judge Comerford's motion is grounded on the fact that plaintiffs do not allege that he acted with the intent to discriminate against children of unmarried parents. Judge Comerford's argument has two steps:

Case: 1:18-cv-04821 Document #: 25 Filed: 09/04/18 Page 103 of 110 PageID #:586

First, he asserts that      it is a necessary element of plaintiffs' eq
protection claim. Second, he contends that the exception to the intent
requirement is inapplicable here because the alleged overtly
discriminatory classification does not involve a suspect class.

Judge Comerford's argument that discriminatory intent is a necessary
element of plaintiffs claim is based on his view that the rules
classifying children according to the marital status of their parents are
facially neutral. He relies chiefly on the equal protection doctrine of
*Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976),
and its progeny. *Davis* upheld the validity of a written test that was part
of the application to the District of Columbia police department even
though white applicants passed the test more often than black
applicants. *Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), upheld a municipal
zoning decision to deny a petition to rezone an area from single-family
to multi-family use even though single-family zoning tended to
perpetuate racially segregated housing patterns. These were facially
neutral state policies that were challenged as racially discriminatory
and upheld as valid absent proof of discriminatory intent. Similarly,
*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct.
2282, 60 L.Ed.2d 870 (1979), involved a facially neutral statute: a
veterans' preference in civil service positions. In *Fenney*, the Supreme
Court extended *Davis* to cover gender discrimination cases, holding
that the statute was constitutional even though it worked to exclude
many women from government jobs. Since illegitimacy, like gender, is
analyzed using an intermediate level of scrutiny, *see, e.g., Clark v. Jeter*,
486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988) (citations
omitted), Judge Comerford argues that the framework set out in
*Feeney*, with an intent requirement, applies to this case. According to
this analysis, plaintiffs' failure to allege discriminatory intent is fatal to
plaintiffs' claims.

The *Feeney* analysis does not apply because this case does not involve a
facially neutral statute or policy. General Order 1.2 of the Cook County
Circuit Court provides:

> [T]he Domestic Relations Division hears actions or
> proceedings concerning dissolution of marriage, legal
> separation, declaration of invalidity of marriage, custody,
> actions brought to modify or enforce provisions of order or
> decrees requiring the payment of maintenance or support,
> actions commenced under the Uniform Reciprocal
> Enforcement of Support Act and actions to enforce orders
> requiring payments from persons legally responsible for the
> support of persons who are recipients under the Illinois Public
> Aid Code.

Rule 13.1 of the Circuit Court of Cook County provides, in pertinent
part:

Domestic Relation cases are proceedings for an order of judgment relating to dissolution of marriage, legal separation, declaration of invalidity of marriage, custody, visitation and all other matters which may be brought under General Order 1.2-1(Ill) of the Circuit Court of Cook County, Illinois.

General Order 2.2(b)(i) provides:

> The Municipal Department hears civil actions and proceedings at law for money not in excess of $5,000, actions of replevin for property of value not in excess of $15,000, actions of forcible entry and detainer unless joined with a claim for money in excess of $15,000 and proceedings ancillary and supplemental thereto, including attachment, garnishment, distress and citation. The Municipal Department also hears actions arising under the Parentage Act of 1984, as amended.

The argument that these provisions are facially neutral is semantic. These court rules do not baldly state that all cases involving children of married parents are heard in one place and all cases involving children *706 of unmarried *706 parents are heard in another. However, read in conjunction with each other, these rules establish different systems for children of married and unmarried parents. General Order 2.2(b)(i) makes clear that the municipal department hears cases arising under the Paternity Act. This is not a situation of disparate impact where a rule affects one group more harshly than another; *all* children of unmarried parents are dealt with differently. The General Orders act as a fork in the road, sending children of married parents in one direction and children of unmarried parents in another. This is a classification system. It is clear and overt.

The amended complaint is sufficient even though discriminatory intent is not alleged because discriminatory intent is not required in a challenge to overt discrimination. As the Supreme Court stated in *Wayte v. United States,* 470 U.S. 598, 608 n. 10, 105 S.Ct. 1524, 1531 n. 10, 84 L.Ed.2d 547 (1985), "[a] showing of discriminatory intent is not necessary when the equal protection claim is based on an overtly discriminatory classification." Since plaintiffs are challenging a system in which the marital status of a child's parents determines how his or her case will be handled, proof of discriminatory intent is unnecessary.

Second, Judge Comerford argues that the exception to pleading intent only applies to suspect classifications. Because illegitimacy is not a suspect classification, intent is required. He notes that the two cases cited by plaintiffs, *Wayte* and *Asian American Business Group v. City of Pomona,* 716 F. Supp. 1328, 1332 (C.D.Cal. 1989), both involve suspect classifications. He concludes that cases not involving suspect classifications must allege discriminatory intent. He provides no support for this proposition. In fact, the Supreme Court has not required a showing of discriminatory intent in equal protection cases involving illegitimate children. *See, e.g., Clark v. Jeter,* 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988); *Mills v. Habluetzel,* 456 U.S. 91, 102

S.Ct. 1549, 71 L.Ed.2d        (1982); *Trimble v. Gordon*, 430 U.S. 762; 9
S.Ct. 1459, 52 L.Ed.2d 31 (1977); *Gomez v. Perez*, 409 U.S. 535, 93 S.Ct.
872, 35 L.Ed.2d 56 (1973); *Weber v. Aetna Casualty Surety Co.*, 406 U.S.
164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). These cases involved clear
classifications of children as legitimate and illegitimate. The Supreme
Court inquired only as to whether the classification was substantially
related to an important government interest. The logical conclusion is
that discriminatory intent is not required when a statute overtly
discriminates between legitimate and illegitimate children.

Because the amended complaint states a cause of action upon which
relief could be granted, the motion to dismiss under Fed.R.Civ.P. 12(b)
(6) is denied.

## 2. Plaintiffs' Motion For Class Certification

A suit may be maintained as a class action only if (1) the class is so
numerous that joinder of all members is impracticable; (2) there are
questions of law or fact common to the class; (3) the claims or defenses
of the representative parties are typical of the claims or defenses of the
class; (4) the representative parties will fairly and adequately protect
the interests of the class; (5) the party opposing the class has acted or
refused to act on grounds generally applicable to the class, thereby
making appropriate final injunctive relief or corresponding declaratory
relief with respect to the class as a whole. Fed.R.Civ.P. 23(a) and (b)(2).

Plaintiffs are entitled to certification because they have made the
required showing on each of these elements. First, plaintiffs have
shown that joinder is impracticable. The class would cover children
whose support, custody and visitation issues are being or will be
litigated under the Parentage Act and those whose support, custody
and visitation issues were decided before June 2, 1993, but may move
back into the class should their parents seek modification or
enforcement. The class consists of tens of thousands of children,
although the exact number is impossible to pinpoint. The exact
number or identity of class members need not be pleaded. *Patrykus v.
Gomilla*, 121 F.R.D. 357, 360 (N.D.Ill. 1988), citing 1 H. Newberg,
*Newberg on Class Actions* ¶ 3.05 (2d ed. 1985). A finding of numerosity is
707    valid so long as it is supported by common *707 sense assumptions.
*Grossman v. Waste Management, Inc.*, 100 F.R.D. 781, 785 (N.D.Ill. 1984).

Second, plaintiffs have shown that there is a question of law common
to all class members: whether Judge Comerford violated the equal
protection clause of the Fourteenth Amendment by creating and
enforcing two different systems for adjudicating claims related to the
support, custody and visitation of children. Judge Comerford argues
that not all members of the class have difficulty obtaining attorneys
and that not all members of the class would prefer to have their cases
heard in the Daley Center. Plaintiffs do not assert that every class
member shares every concern listed in paragraph 19 of their amended
complaint. Some factual variation among the class grievances does not
defeat the class. *Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992)

(citations omitted).      ² Comerford's objections to the common

of facts do not defeat the class. In any event, the undeniably common question of law predominates.

Third, plaintiffs have shown that their claims are representative of the class' claims because their claims arise from the same event or course of conduct giving rise to the claims of the other class members and are based on the same legal theory. *See, e.g., Rosario,* 963 F.2d at 1018 (citations omitted); *In re VMS Securities Litigation,* 136 F.R.D. 466, 475 (N.D.Ill. 1991).

Fourth, plaintiffs have shown they will fairly and adequately represent the class. A named plaintiff fairly and adequately represents the class when her attorney is qualified and when the plaintiff has no interest antagonistic to those of the class. *See, e.g., Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir. 1986); *In re VMS Securities Litigation,* 136 F.R.D. at 478-79. Plaintiffs are represented by attorneys from the Legal Assistance Foundation of Chicago ("LAF"). LAF attorneys have handled hundreds of family law cases and have extensive experience with class actions. Plaintiffs' Mot. at 12. Plaintiffs have no antagonistic interests because their interests are absolutely identical to the interests of the other class members and they seek the same relief: "access to a scheme of justice in which all custody, visitation, and support cases are assigned to courtrooms and provided services without regard to the minor child's birth status." *Id.*

Judge Comerford counters that plaintiffs are not adequate class representatives because plaintiffs have failed to establish that the class representatives have adequate knowledge of the suit to represent the other members of the class. This court seriously doubts whether plaintiffs, who are all under the age of ten, have a full and sophisticated understanding of the facts and law involved in their case. However, Judge Comerford does not question whether plaintiffs' *counsel* will adequately protect the interests of the class. This court is satisfied that counsel will do so. Courts recognize that plaintiffs need not always have a detailed understanding of their complaint and may rely on their lawyers' knowledge and expertise in litigating their claims. *In re VMS Securities Litigation,* 136 F.R.D. at 478 (citations omitted).

Finally, plaintiffs have shown that Judge Comerford has acted on grounds generally applicable to the class as a whole because Judge Comerford is responsible for enforcing the separate adjudication systems for children of married parents and children of unmarried parents.

Plaintiffs' motion for class certification is granted. The court certifies the following class under Fed.R.Civ.P. 23(c)(1): All children under 18 years of age:

> (1) whose parents have never been married to each other, and

(2) as to whom i      involving support paid on their behalf, custody, and visits with them by their non-custodial parents are being litigated in the Parentage Court courtrooms of the First District of the municipal department of the Cook County Circuit Court or in the Support Enforcement courtrooms of the domestic relations division of the county department *708 of the Cook County Circuit Court on or after June 2, 1993.

708

## *CONCLUSION*

The motion to dismiss is denied. Judge Comerford is directed to answer the amended complaint by October 6, 1993. Plaintiffs' motion for class certification is granted. *719

719

Make your practice more effective and efficient with Casetext's legal research suite.

Request Demo

Pricing

Features

About us

Jobs

Blog

Podcast

Students

News

Help and FAQs

Contact us

Privacy

Terms

© 2018 Casetext Inc.
Casetext, Inc. and Casetext are not attorneys or a law firm and do not provide legal advice.

# Exhibit Z

"In the early 1980s, the court system was rocked by the federal Operation Greylord investigation. A host of sitting judges, lawyers and court personnel were convicted of crimes that included taking bribes and fixing cases. In the aftermath, Judge Comerford appointed a panel led by Jerold Solovy of Jenner & Block to recommend ways to clean up the courts. The commission's recommendations, issued in December 1984 and subsequently implemented by Judge Comerford, included limiting conversations between judges and attorneys in hallways and other non-courtroom settings."

(http: /ww.chicagotribune.com)

# Judge Harry Comerford dies

### headed Cook County courts for 16 years

### Chicago jurist guided court system during federal Operation Greylord probe into judicial corruption

January 30, 2008 | By Trevor Jensen, Tribune reporter



**249**　　G+

Harry Comerford was chief judge of Cook County's sprawling court system during 16 years that witnessed expansion of suburban courthouses as well as the tumult of the Operation Greylord investigation into judicial corruption.

Judge Comerford, 86, of Glenview died of pulmonary fibrosis on Tuesday, Jan. 29, in Glenbrook Hospital in Glenview, said his daughter Sally.

Judge Comerford was first elected chief judge of Cook County Circuit Court in 1978 by his fellow judges. He was only the second person to hold that position in a court system that was consolidated in the 1960s and has been for many years the country's largest unified court system.

At the time of his election, he had already served 18 years on the bench, 11 of them in the county division handling civil cases. He was named head of the county division in 1969.

As chief judge, he was in charge of a multimillion-dollar budget and assigning judges within the system. He was a close friend of longtime Cook County Board President George Dunne, an unquestionable asset in getting his budgets and initiatives approved.

During his tenure, suburban court branches in Rolling Meadows, Skokie and Bridgeview were expanded, as was the Criminal Courts Building at 26th Street and California Avenue in Chicago. A random judicial assignment system was instituted to ensure cases wouldn't be steered to a particular judge. He built a research

Case: 1:19-cv-04324 Document: 28 Filed: 09/04/19 Page 110 of 110 PageID #:593

said Jim Wilson, who served as court administrator under Judge Comerford from 1979 to 1988.

In the early 1980s, the court system was rocked by the federal Operation Greylord investigation. A host of sitting judges, lawyers and court personnel were convicted of crimes that included taking bribes and fixing cases.

In the aftermath, Judge Comerford appointed a panel led by Jerold Solovy of Jenner & Block to recommend ways to clean up the courts. The commission's recommendations, issued in December 1984 and subsequently implemented by Judge Comerford, included limiting conversations between judges and attorneys in hallways and other non-courtroom settings.

At the time of his retirement, Judge Comerford lamented that Operation Greylord was seen by the public "as a systemic type thing when in fact it was the result of some greedy people that should have never been on the bench."

Watching colleagues he thought he could trust found guilty of taking bribes and sent off to prison was tough on Judge Comerford, said longtime friend and legal partner Dick Schultz.

"He had to hold it together, and I thought he did a superb job," Schultz said. "He cooperated fully with federal authorities."

Current Chief Judge Timothy Evans said that Judge Comerford "recognized it was necessary to let the public know that this was an aberrational set of circumstances, that most judges were there to settle their disputes honestly, reliably and above-board."

Judge Comerford was raised on Chicago's Near North Side.

He graduated from DePaul Academy High School and received a degree in business from DePaul University. He received his law degree from DePaul in 1947.

He was a Navy lieutenant in the Pacific during World War II. Back in Chicago, he was a special assistant attorney general, ran a private practice and worked as a lawyer for the Chicago Park District before being elected judge in 1960.

After stepping down from the bench, Judge Comerford continued to practice law.

Besides his daughter, survivors include his wife of 57 years, Noreen; another daughter, Susan Jacobs; a son, Brien ; a sister, Ann Babcock; four grandchildren; and two great-grandchildren.

Visitation will be from 5 to 9 p.m. Friday and from 10 to 11 a.m. Saturday in St. Mary of the Woods Catholic Church, 7033 N. Moselle Ave., Chicago. Mass will be said in the church at 11 a.m. Saturday.

-----------